**WCM INDUSTRIES, INC., Plaintiff–Appellant and Cross–Appellee,**

**v.**

**TRUSTEES OF THE HAROLD G. WILSON 1985 REVOCABLE TRUST, Elsie G. Wilson 1985 Revocable Trust, David H. Wilson Trust, Michael David Wilson Trust, Steven Allen Wilson Trust, and David Wilson, Defendants–Appellees and Cross–Appellants.**

No. 95CA1528.

Colorado Court of Appeals,
Div. I.

April 3, 1997.

Rehearing Denied June 12, 1997.

Certiorari Denied Dec. 15, 1997.

Rothgerber, Appel, Powers & Johnson, Ann S. Vessels, Bruce N. Warren, Colorado Springs, for Plaintiff–Appellant and Cross–Appellee.

Fairfield and Woods, P.C., Peter F. Brietenstein, Neil T. Duggan, David L. Joeris, Denver, for Defendants–Appellees and Cross–Appellants.

Opinion by Judge CASEBOLT.

This is an action concerning dissenting shareholders' rights in a corporate stock reorganization and merger. Plaintiff, WCM Industries, Inc., appeals the trial court's determination of the number of outstanding shares of WCM at the time of merger, the court's refusal to apply a marketability discount in determining the fair value of the defendants' shares, the court's determination of the fair value of WCM's shares, and its denial of WCM's motion for, *inter alia,* costs and attorney fees. In their cross-appeal, defendants, trustees of the Harold G. Wilson 1985 Revocable Trust, other Wilson family trusts, and David Wilson, assert as error certain findings made by the appraiser appointed by the court as well as the court's award to them of only 6% post-judgment interest. We reverse and remand for further proceedings.

In early 1992, WCM, a closely held corporation, had 60,300 shares of its corporate stock issued and outstanding. Defendants owned 16,500 shares, certain employees owned 5,300 shares, and the remaining shares were owned by WCM's president and his sister. In that year, WCM proposed a plan of merger, the purpose of which was to consolidate ownership of its stock in persons actively involved in its business operations.

In July 1992, the board of directors of WCM met to determine a price to be paid to those persons who would no longer be shareholders in WCM under the proposed plan. The board determined that a price of $192 per share was an appropriate price to effec-

tuate the merger and avoid litigation. The president's sister accepted that price for her shares. Defendants rejected the price.

Prior to the merger on September 1, 1992, of WCM with its successor corporation, WCM exercised its rights under stock purchase agreements to redeem the 5,300 employee shares owned by persons not parties to this proceeding. While the stock purchase agreements required WCM to pay 100 percent of the merger price, those stockholders waived such rights. In consideration for that waiver, they instead received a price of $68.62 per share together with a purported right to purchase an equal number of shares in the successor corporation after the merger. The redeemed shares were then canceled, and the merger was approved by the remaining shareholders, with defendants dissenting.

After the merger, the board of directors met and, as required by § 7–4–124, C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994) determined that the "fair value" of defendants' shares was $153.60 per share, as of the day before the merger. *See* § 7–4–124(1)(c), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994). That statute defined fair value as:

> [T]he value of shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of such corporate action, unless such exclusion would be inequitable.

The board then paid the defendants $153.60 per share, plus interest at the rate of 6% per annum from the date of merger. The defendants disputed the board's determination of the fair value of their shares, asserting that each share was worth "not less than $365."

Thereafter, WCM filed a petition pursuant to § 7–4–124(8)(a), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994), requesting the court to determine the fair value of defendants' shares. In its petition, WCM also requested costs and attorney fees under § 7–4–124(9)(a) and § 7–4–124(9)(b), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994) based upon its assertion that the defendants' demand for "supplemental payment" for

their shares was "arbitrary, vexatious, and not in good faith."

The trial court appointed an appraiser under § 7–4–124(8)(d), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994) to make a recommendation to the court concerning the fair value of the defendants' shares. In December 1994, following several hearings, the appraiser issued a final recommendation. He determined that, on the day before the merger: 1) the enterprise value of the corporation was $12,658,000; 2) there were 55,000 outstanding shares of corporate stock (not 60,300, as urged by the corporation) because the options for the 5,300 shares previously redeemed by the corporation had not matured into a legal obligation of the corporation; and, consequently, 3) the fair value of each of defendants' shares was $230.15. The appraiser also rejected WCM's request to apply a marketability discount.

The trial court adopted all of the findings and conclusions of the appraiser. Thereafter, it denied WCM's motion for costs and attorney fees and entered judgment in favor of the defendants in the amount of $1,263,075 plus interest in the amount of $225,879.91, together with 6% post-judgment interest from the date of judgment. These appeals followed.

WCM contends that the trial court erred by: (1) refusing to apply a marketability discount in determining the fair value of defendants' shares; (2) incorrectly determining the number of outstanding shares in the corporation or, alternatively, in failing to reduce the enterprise value of the corporation by approximately $1 million to account for contract rights of the previous holders of the redeemed shares; and (3) denying its motion for costs and attorney fees pursuant to § 7–4–124(9)(a) and § 7–4–124(9)(b). We agree in part.

## I.

WCM first contends that, as a matter of law, a marketability discount must be applied in situations in which a closely held corporation's shares are valued under § 7–4–124, C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994). We disagree, conclud-

ing instead that a marketability discount may, in appropriate circumstances, be applied, but that such a determination is a factual one that must be made on an *ad hoc,* case-by-case basis.

The term "fair value" as used in the dissenter's rights statute imports a broader approach to valuation than does the term "fair market value." A proper determination of fair value will depend upon the particular circumstances of the corporation involved. *Walter S. Cheesman Realty Co. v. Moore,* 770 P.2d 1308 (Colo.App.1988).

In determining fair value, a court must consider all relevant value factors, the most important of which are market value, investment or earnings value, and net asset value. *Pioneer Bancorporation, Inc. v. Waters,* 765 P.2d 597 (Colo.App.1988).

A judicial determination of fair value is not susceptible to calculation by any precise mathematical formula, and certain approaches to valuation may not present a reliable measure of value in a particular case. Thus, the weight to be assigned to each value factor depends upon the facts and circumstances of each case, and the court may properly decide to assign little or no weight to a factor it determines to be unreliable. *Pioneer Bancorporation, Inc. v. Waters, supra.*

Contrary to WCM's contention, we read *Pioneer Bancorporation, Inc. v. Waters, supra,* and *Walter S. Cheesman Realty Co. v. Moore, supra,* to allow, but not to require, a discount for lack of marketability of all shares of a corporation to be considered in determining "fair value." Such a determination will, of necessity, depend upon the facts and circumstances of each case. *See also Columbia Management Co. v. Wyss,* 94 Or. App. 195, 765 P.2d 207 (1988) ("fair value" under similar statute does not mean "fair market value"; term requires consideration of market value, net asset value, and earnings or investment value).

Nor do we perceive that *Breniman v. Agricultural Consultants, Inc.,* 829 P.2d 493 (Colo.App.1992), also relied upon by WCM, dictates a different result. There, a division of this court stated that "fair value is akin to

fair market value." We do not, however, understand the *Breniman* court to have equated the two. Moreover, *Breniman* did not concern a merger, but rather a sale of assets, and the issue on appeal did not involve a determination of fair value. Instead, the primary issue was whether the dissenter's recovery would be measured by the redemption value set forth in the corporation's articles of incorporation or instead by the fair value of the stock.

Additionally, our review of the out-of-state cases cited by WCM reveals a majority rule that a marketability discount is not required as a matter of law but, rather, may be employed by a fact finder, depending upon the particular facts and circumstances. *See Perlman v. Permonite Manufacturing Co.,* 568 F.Supp. 222 (D.Ind.1983) (applying Indiana law); *Columbia Management Co. v. Wyss, supra; Independence Tube Corp. v. Levine,* 179 Ill.App.3d 911, 129 Ill.Dec. 162, 535 N.E.2d 927 (1988); *Ford v. Courier–Journal Job Printing Co.,* 639 S.W.2d 553 (Ky.App.1982); *Atlantic States Construction, Inc. v. Beavers,* 169 Ga.App. 584, 314 S.E.2d 245 (1984); *King v. F.T.J., Inc.,* 765 S.W.2d 301 (Mo.App.1988); *contra In re Dissolution of Gift Pax, Inc.,* 123 Misc.2d 830, 475 N.Y.S.2d 324 (1984); *Raskin v. Walter Karl, Inc.,* 129 A.D.2d 642, 514 N.Y.S.2d 120 (1987).

Nevertheless, WCM argues that the appraiser's findings and conclusions, as approved by the court, reflect a misunderstanding and misapplication of these principles. We agree that a remand for clarification of the findings and conclusions is required.

Here, the appraiser stated that the decision whether to apply a marketability discount "involved conflicting policy considerations." However, he then reviewed case law dealing with *minority* share discounts, and determined that the majority rule, with which he concurred, prohibited application of such discounts. He then analyzed pertinent Colorado authority, as cited above, and concluded that application of a *minority* share discount would be disapproved.

While some of the cases reviewed by the appraiser dealt with marketability discount issues, or both minority share and marketa-

bility discount issues, and the appraiser also mentioned "fair market value" and concluded that "no minority and/or marketability discount should be recognized under the circumstances of this case," we are unable to discern whether the appraiser realized that he could, in his discretion, consider application of a marketability discount under the factual circumstances present here, or whether he concluded that no marketability discount could, as a matter of law, be applied.

Indeed, there are no factual findings that would indicate what facts the appraiser considered, if any, that would support or negate the application of a marketability discount, or whether he in fact considered marketability in reaching his valuation conclusion. *See Mowry v. Jackson,* 140 Colo. 197, 343 P.2d 833 (1959) (court has a duty to make findings and conclusions which must be so explicit as to give the appellate court a clear understanding of the basis of the trial court's decision and to enable it to determine the ground on which it reached its decision); *In re Marriage of Van Inwegen,* 757 P.2d 1118 (Colo.App.1988) (same); *see also* C.R.C.P. 52.

Accordingly, because we are unable to discern whether the appraiser correctly applied the law, and we find no factual discussion concerning the propriety of using a marketability discount, we must remand the cause for further consideration.

■ Upon remand, some of the many factors that the appraiser may consider in determining whether a marketability discount is appropriate are: whether the corporation is closely held, its tax status, whether there is any established or other market for the corporation's shares, the liquidity of the corporation and its shares, the nature and history of the business, the general economic outlook of the company and its specific industry, the book value of the stock, the financial condition of the business, its earning capacity, its dividend paying capacity, the value of good will and other intangibles, sales of stock, the market price of stock of corporations engaged in like businesses, Internal Revenue Service guidelines, and whether the stock is subject to restrictive agreements concerning its sale. We emphasize, however, that the appraiser and the trial court may consider any relevant factor relative to the worth and value of the corporation and its stock that is reasonable under the circumstances and is justified by the evidence presented. *See Walter S. Cheesman Realty Co. v. Moore, supra.*

## II.

■ WCM next argues that the court erred in determining that there were 55,000 shares outstanding at the time of the merger. We disagree.

The credibility of witnesses, the sufficiency, probative effect, and weight of all evidence, including documentary evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the trial court, and its treatment thereof will not be disturbed on review unless clearly erroneous. *Cottonwood Hill, Inc. v. Ansay,* 709 P.2d 62 (Colo.App.1985).

Findings of fact are not to be set aside unless clearly erroneous and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. C.R.C.P. 52.

Here, in his determination of the number of outstanding shares, the appraiser set forth three well-grounded, independent bases for his conclusion that the options for the 5,300 shares had not ripened into a legal obligation of the corporation and could not, therefore, be included in the total number of outstanding shares.

The appraiser concluded that WCM's president did not have authority to grant options to the shareholders whose stock was redeemed; that WCM's counsel had stated in a letter to shareholders prior to the merger that the board of directors had not yet approved such a plan; and that no options were validly granted until after the merger had occurred.

These determinations were factual in nature, and we are unpersuaded that they were clearly erroneous. Therefore, the number of shares outstanding need not be reconsidered on remand. *See* C.R.C.P. 52.

## III.

■ Alternatively, WCM asserts that, even if the appraiser correctly determined the number of outstanding shares, he failed to consider whether the value of WCM should be reduced by the liability due and owing to those shareholders whose stock was previously redeemed by WCM. We agree that this issue must be reconsidered.

Here, before the merger was envisioned, WCM approved proposals by which 5,300 shares of WCM stock were issued to various employees. Those shares were issued subject to a stock purchase agreement that required WCM, in the event it redeemed the shares pursuant to a merger, to pay 100 percent of the merger price. These 5,300 shares were redeemed by August 1992, shortly before the merger.

At the merger price of $192 per share, WCM's total liability would have been $1,017,000. However, all of those shareholders waived their right to receive the full merger price, instead receiving the right to $68.62 per share together with the proviso that each would be permitted "to purchase an equal number of shares under the same terms and conditions in the surviving company."

Accordingly, even if, as the appraiser found, these "option rights" were invalid, there remained an issue whether, and in what amount, WCM had any obligation, express or implied, to pay those remaining shareholders the $68.62 per share and/or the difference between the $68.62 per share recited, and the merger price of $192 per share.

While the record reflects that this issue was advanced to the appraiser, we find no discussion of this alternative argument in his findings and conclusions. Consequently, we are again unable to ascertain whether the appraiser considered this contention and rejected it as a matter of fact or, conversely, failed to consider the issue at all. *See Mowry v. Jackson, supra.* Accordingly, we must remand the cause for reconsideration of this issue.

## IV.

WCM next contends that the trial court erred in denying its motion for costs, attorney fees, expert fees, and appraiser fees pursuant to § 7–4–124(9)(a) and § 7–4–124(9)(b). In view of our determination above that the cause must be remanded for consideration of the marketability discount issue and the outstanding liability, if any, that WCM may have had to employee shareholders whose stock was redeemed, and in view of the factual nature of the inquiry that must occur in determining the propriety of an award of fees of counsel, experts, and the appraiser, we conclude that the district court should revisit this issue on remand.

## V.

On cross-appeal, defendants contend that certain of the appraiser's factual findings and conclusions were clearly erroneous. The asserted errors include findings concerning WCM's debt-equity ratio and the appropriate discount rate to apply, the cost of equity, the growth rate, the offsetting nature of mistakes concerning the calculation of officer's bonus vis-a-vis a failure to account for certain dividends paid before the valuation date, the projection of inventory and accounts receivable, and the projection of income for 1992. They further contend that WCM failed to give WCM's expert critical information about 1992 income projections and that their shares were undervalued as a result. We disagree.

In determining the enterprise value of WCM, the appraiser made a determination of the credibility of the principal expert witnesses, concluding that the expert testifying on behalf of WCM "clearly demonstrated more knowledge of WCM and its operations," had "extensive contact with the management of WCM," and was "simply the more credible witness because of the nature and extent of his work, his more balanced economic analysis, and his answers to questions on cross-examination."

This determination of the credibility of the parties' expert witnesses rests exclusively within the province of the appraiser. Furthermore, there exists ample support in the record for the appraiser's determination of

the enterprise value of the corporation. Accordingly, the judgment of the trial court in this regard is not clearly erroneous and will not be disturbed. *See Cottonwood Hill, Inc. v. Ansay, supra;* C.R.C.P. 52.

## VI.

■ Defendants also assert in their cross-appeal that they are entitled to post-judgment interest at the rate of 8%. We agree with the defendants that the trial court's judgment awarding post-judgment interest at the rate of 6% did not contemplate the interest rate applicable in the event of an appeal, and therefore, the matter must be remanded for recalculation of postjudgment interest in accordance with § 5–12–106(3), C.R.S. (1992 Repl.Vol. 2).

Section 5–12–106, C.R.S. (1992 Repl.Vol. 2) concerns the rate of interest on judgments which are appealed. It provides, in pertinent part, that when there is no written agreement as to the rate of interest, creditors shall receive interest as follows:

> (1)(a) If a judgment for money in a civil case is appealed by a judgment debtor and the judgment is affirmed, interest, as set out in subsections (2) and (3) of this section, shall be payable from the date of entry of judgment in the trial court until satisfaction of the judgment and shall include compounding of interest annually.

Section 5–12–106(3) provides:

> The rate at which interest shall accrue during each year shall be the rate which the secretary of state has certified as the annual interest rate under subsection (2) of this section.

In making its determination that the applicable postjudgment interest rate was 6%, the trial court relied upon the provisions of § 7–4–124(6)(c), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994) in conjunction with the definition of "interest" contained in § 7–4–124(1)(d), C.R.S. (1986 Repl.Vol. 3A) (repealed effective July 1, 1994). However, that statute is inapplicable because it concerns interest accruing from the "effective date of the corporate action until the date of payment." Section 7–4–124(1)(d). It does not concern post-judgment interest. Absent circumstances not present here, once a judgment has been entered and an appeal is taken, the post-judgment interest statute is applicable.

The judgment is reversed and the cause is remanded for further proceedings consistent with the views set forth in this opinion.

METZGER, J., concurs.

NEY, J., concurs in part and dissents in part.

Judge NEY, concurring in part and dissenting in part.

I concur in part and dissent in part.

I concur fully in Parts II, IV, V, and VI of the majority opinion, but dissent as to Parts I and III.

I concur with the majority's rejection of WCM's assertion that, as a matter of law, a marketability discount must be applied here. Although I agree with the majority that a marketability discount may, in appropriate circumstances, be applied to determine the fair value of dissenters' shares, I would conclude that the determination whether to apply such a discount is a factual one, and therefore, such a determination will not be disturbed on appeal if supported by the record.

Because I would conclude that the appraiser's recommendation here not to apply a marketability discount was based upon facts amply supported by the evidence, I would not remand for further findings, but rather, would affirm the judgment as to all issues discussed in Part I of the majority opinion.

With respect to Part III, I disagree with the majority that remand for reconsideration of the issues contained therein is necessary. I would affirm the trial court's resolution of those issues.

I am in accord with the majority's opinion, set forth in Part VI, that a remand for recalculation of post-judgment interest is required. I would otherwise affirm the judgment of the trial court.