**M LIFE INSURANCE COMPANY,**
**a Colorado corporation,**
**Petitioner–Appellant,**

v.

**SAPERS & WALLACK INSURANCE**
**AGENCY, INC., Respondent–**
**Appellee.**

No. 99CA0847.

Colorado Court of Appeals.
Division II.

Feb. 1, 2001.

As Modified on Denial of Rehearing
May 10, 2001.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, CO; Yu Stromberg, Cleveland, P.C., Frederick Y. Yu, Michael M. Schmidt, Karen L. Allison, Denver, CO, for Petitioner–Appellant.

Faegre & Benson, LLP, Michael S. McCarthy, Jeanne M. Coleman, Christopher P. Beall, Denver, CO, for Respondent–Appellee.

Opinion by Judge NIETO.

Petitioner, M Life Insurance Company (M Life), appeals a judgment determining the fair value of M Life shares owned by Sapers & Wallack Insurance Agency, Inc. (S & W), which was entered pursuant to the Colorado Dissenters' Rights statute, § 7–113–101, et seq., C.R.S.2000. M Life also appeals the order assessing it for the fees and expenses S & W incurred for counsel and experts. We dismiss the appeal as it relates to the fees and expenses of counsel and experts, affirm the judgment in part and reverse it in part, and remand with directions.

S & W was a Class A shareholder of M Life. In 1996, M Life implemented a merger with another corporation. As a result, issued and outstanding shares of M Life were converted into shares of the new entity. S & W dissented, thus triggering the provisions of §§ 7–113–101 to 7–113–302. M Life petitioned the trial court to determine the fair value of S & W's shares. The court did so, and this appeal followed.

M Life asserts three contentions of error: First, the trial court erred by failing to recuse itself after issuing an order that included unfavorable references to certain of M Life's witnesses, and drew unfavorable conclusions from M Life's failure to produce certain documents. Second, the trial court erred in its determination of "fair value" for S & W's shares of stock. Third, the trial

court erred by ordering M Life to pay S & W's fees and expenses incurred for counsel and experts.

## I.

■ M Life first contends that the trial judge erred by failing to recuse himself because of alleged bias and prejudice which M Life asserts is evident from the order granting S & W's motion to compel and for sanctions. Specifically, M Life argues that findings of fact contained in the order dated June 29, 1998, demonstrated the trial judge's prejudice and prevented him from fairly considering the evidence in the case. M Life also asserts that the trial court erred by denying its motion to reconsider the order for sanctions. We do not agree.

Disqualification of a judge in a civil case is controlled by C.R.C.P. 97. That rule provides, in pertinent part, "A judge shall be disqualified in an action in which he is interested or prejudiced.... A judge may disqualify himself on his own motion ... or any party may move for such disqualification and a motion by a party for disqualification shall be supported by affidavit."

■ The critical test is whether the supporting affidavits establish facts from which it may reasonably be inferred that the judge is prejudiced or biased. In deciding the motion, the judge must accept the affidavits as true. However, mere opinions or conclusions unsupported by facts are not sufficient. The judge must determine if the facts presented support a reasonable inference of actual or apparent bias or prejudice. If such showing is made, the judge must disqualify himself or herself from the case. *Goebel v. Benton*, 830 P.2d 995 (Colo.1992).

■ The question whether a judge should be disqualified from a civil case is a matter within the discretion of the trial court, *Wright v. District Court*, 731 P.2d 661 (Colo. 1987), and that decision will not be disturbed on appeal unless it constitutes an abuse of discretion. *In re Marriage of Mann*, 655 P.2d 814 (Colo.1982).

■ "The general rule of law is that what a judge learns in his judicial capacity is a proper basis for judicial observations, and that the use of such information is not the kind of matter that results in disqualification." *Smith v. District Court*, 629 P.2d 1055, 1057 (Colo.1981). Legal rulings on issues appropriately before the trial court are not grounds for recusal. *Holland v. Board of County Commissioners*, 883 P.2d 500 (Colo.App.1994).

Here, the trial court entered orders regarding discovery violations and sanctions. M Life asserts that the trial court's findings of fact contained prejudicial statements which undermined the trial court's ability to render a fair and impartial decision in this case. Specifically, the trial court's order found that M Life had permitted its experts to make "false and misleading representations," which resulted in "material prejudice" to S & W. M Life argues that these findings constituted prejudgment of its expert witnesses' credibility, and prejudgment of the significance of documents that were later used at trial.

The trial court's decision to impose sanctions for discovery violations was predicated upon a finding that M Life had violated discovery rules and ignored disclosure deadlines. These findings were necessary for resolution of the motions pending before the court. The court made it clear in comments during the hearing that it was only deciding the discovery issues, and was not deciding on the admissibility or relevance of the material.

A review of the motion to disqualify and the supporting affidavits, which we must accept as true, does not reveal facts from which it may reasonably be inferred that the judge was biased or prejudiced. *See Zoline v. Telluride Lodge Ass'n*, 732 P.2d 635 (Colo.1987).

The findings that M Life considers prejudicial reveal that the judge was displeased by the manner in which M Life was conducting discovery. However, the findings were based on the motions filed and the arguments of counsel; they cannot be fairly read as showing bias or prejudice. Accordingly, we conclude that the trial court's refusal to disqualify itself was not an abuse of discretion. *See In re Marriage of Mann, supra.*

Further, discovery sanctions are ordinarily within the discretion of the trial court and will not be reversed absent a finding of abuse of that discretion. *J.P. v. District Court,* 873 P.2d 745 (Colo.1994). There is support in the record for the imposition of sanctions against M Life. Therefore, the trial court did not abuse its discretion by imposing sanctions against M Life or by denying M Life's motion to reconsider this ruling.

## II.

M Life next contends that the trial court erred in determining the fair value of S & W's shares. Specifically, M Life asserts that the court erred by including going concern value and by failing to apply minority and marketability discounts. M Life also argues that the court's determination of fair value was arbitrary because its findings do not adequately explain how the value was determined. We agree with M Life only on the issue of a marketability discount, and as to that issue remand with directions.

The trial court's task in this action was to determine the fair value of S & W's shares.

> "Fair value," with respect to a dissenter's shares, means the value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action except to the extent that exclusion would be inequitable.

Section 7–113–101(4), C.R.S.2000. The term "fair value" used in the dissenters' rights statute connotes a broader approach to valuation than does the term "fair market value."

The determination of fair value will depend on the particular circumstances of the corporation involved. *Walter S. Cheesman Realty Co. v. Moore,* 770 P.2d 1308 (Colo.App.1988). In determining fair value, the court must consider all relevant value factors, the most important of which are market value, investment or earnings value, and net asset value. *WCM Industries v. Trustees of Wilson Trust,* 948 P.2d 36 (Colo.App.1997).

The determination of fair value is not susceptible to an analysis by any precise mathematical formula. Certain approaches to valuation may not be appropriate in a particular case, and therefore, the weight to be given to each value factor depends upon the facts and circumstances of each case. The court may assign as much or as little weight to each factor as it determines to be appropriate. *Pioneer Bancorporation, Inc. v. Waters,* 765 P.2d 597 (Colo.App.1988). This is a factual determination, and the trial court's findings of fact will not be disturbed unless clearly erroneous. *Walton v. State,* 968 P.2d 636 (Colo.1998).

### A.

M Life first argues that its unique corporate structure and bylaws preclude consideration of going concern value in the determination of fair value. It asserts that the trial court's determination that fair value must include going concern value was wrong as a matter of law. We do not agree.

M Life was an agent-owned reinsurance company. Its Class A shareholders were all life insurance agents (agent/shareholders). The Class A agent/shareholders owned seventy-five percent of M Life but elected only two of its seven directors. Each Class A shareholder, including S & W, owned ten shares of Class A stock. These ten shares were issued in a series that tracked the reinsurance issued by M Life on life insurance policies sold by the agent/shareholders through other life insurance companies. M Life only issued reinsurance policies on life insurance policies sold by its agent/shareholders through other life insurance companies. The agent/shareholders did not receive commissions for the sale of reinsurance by M Life.

M Life also issued Class B stock. The Class B shareholders owned twenty-five percent of M Life but elected five of the seven directors. All the Class B stock was owned by an organization known as M Financial. The owners of M Financial founded M Life.

M Life divided its reinsurance policies into groups referred to as "generations." For example, reinsurance policies issued from

1981 to 1983 are called the "M 81 Generation."

The bylaws of M Life allocated profit and loss created by each generation of reinsurance policies only to that generation. Each agent/shareholder shared in the profit and loss of that generation based on the number of reinsurance policies issued to reinsure life insurance policies sold by that agent/shareholder. The agent/shareholders did not share in the profit and loss of generations that did not reinsure life insurance policies sold by them.

S & W wrote policies that were reinsured in the M–81 and M–84 Generations. It did not write any policies that were reinsured with M Life after December 31, 1987, and thus did not participate in the M–91 or M–96 Generations. However, the policies that S & W wrote continued in force to the date of valuation, and therefore, continued to generate income to M Life.

The term "going concern" refers to "an existing solvent business, which is being conducted in the usual and ordinary way for which it was organized." "Going concern value" means "[t]he value of a firm, assuming that the firm's organization and assets remain intact and are used to generate future income and cash flows." *Black's Law Dictionary* 691 (6th ed.1990).

■ The determination of fair value for a dissenting shareholder is controlled by § 7–113–101, et seq., C.R.S.2000, and not by the bylaws of the corporation. *See Breniman v. Agricultural Consultants, Inc.*, 829 P.2d 493 (Colo.App.1992) (articles of incorporation may not supersede requirements of dissenters' rights statutes). However, the unusual structure of M Life is a circumstance of the corporation that must be considered because the fair value determination "will depend upon the particular circumstances of the corporation involved." *WCM Industries v. Trustees of Wilson Trust, supra*, 948 P.2d at 39.

The trial court considered this unusual structure, but did not find it controlling on the issue of going concern value. M Life's corporate structure was taken into account in determining that S & W owned 1.64 percent of M Life, an ownership share agreed upon by experts testifying for both parties. This percentage of ownership was calculated as a share of the total equity accounts of all shareholders, rather than by calculating the percentage of ownership based on the total number of shares held by all shareholders. The equity accounts represented the profits and losses attributable to the agent/shareholder block of reinsurance policies.

It is undisputed that M Life continued doing business after the merger and that the reinsurance policies attributable to S & W continued to generate income to M Life. It is also undisputed that the ownership of the shares had attributes beyond the right to share in profits and losses assigned to the specific generations of reinsurance policies. S & W's shares constituted a share of ownership in the entire corporation and not just a share of ownership in the assets constituting a specific generation of reinsurance polices. For example, the shares provided S & W the right to participate in the corporation by voting for corporate directors.

M Life has acknowledged this value above the right to share in specified profit and loss. It concedes that if M Life were sold or liquidated and realized proceeds above the value of the equity accounts of Class A shareholders, these shareholders would be entitled to share in the excess proceeds.

■ The trial court found that M Life continued in business after the merger that triggered this action, and that it was "a healthy, going concern of considerable value." S & W introduced expert testimony to support the inclusion of going concern value in the valuation of the corporation, while M Life called experts who testified to the contrary. The trial court as fact finder, had discretion to accept or reject all or part of any witness' testimony. *Gordon v. Benson*, 925 P.2d 775 (Colo.1996). After considering the testimony of all the experts, the trial court determined that fair value had to "include a consideration of M Life on a going concern basis."

Since there is support in the record for the trial court's findings of fact, we perceive no

error in the court's consideration of going concern value.

### B.

M Life next argues that the trial court erred by failing to consider minority and marketability discounts in determining the fair value of S & W's shares. We agree in part.

The trial court held that "a minority or marketability 'discount' does not and should not apply in determining 'fair value' under the Colorado Dissenters' Rights Statute as a matter of law or under the circumstances of this case." The trial court did not discuss what circumstances led it to conclude that such discounts are not appropriate in this case. As discussed below, we conclude that minority discounts are not applicable as a matter of law under the circumstances of this case, but a marketability discount may apply.

 As a starting point, it is useful to understand the distinction between these two types of discounts.

A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions. A marketability discount adjusts for a lack of liquidity in one's interest in an entity, on the theory that there is a limited supply of potential buyers for stock in a closely held corporation.

*Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 398–99, 734 A.2d 738, 747 (1999) (citations omitted). It is also important to consider the purpose of the dissenters' rights statutes, which is "to protect the property rights of dissenting shareholders from actions by majority shareholders which alter the character of their investment." *Breniman v. Agricultural Consultants, Inc., supra*, 829 P.2d at 496.

The application of a minority discount in a dissenters' rights action involving a corporation that continues to do business appears to be an issue of first impression in Colorado. The diversity of opinion concerning the applicability of a minority discount was recognized in *Walter S. Cheesman Realty Co. v. Moore, supra*. That case held that a minority discount was not appropriate if the corporation was being dissolved and all assets were being liquidated. Therefore, it did not address the specific issue presented here.

 We conclude that in a dissenters' rights action, where the corporation continues as a going concern, a minority discount does not apply to the valuation of the dissenters' shares of stock. We find the analysis in *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972 (1995), to be compelling. There, the New York Court of Appeals rejected consideration of a minority discount in determining fair value for a dissenting shareholder's stock for the following reasons: (1) it would deprive minority shareholders of their proportionate interest in a going concern; (2) it would value minority shares below majority shares and result in unequal treatment of the same class of shares; (3) it would undermine one goal of the dissenters' rights statute, *i.e.*, preventing minority shareholders from being forced to sell at unfairly low values while allowing the majority to proceed as it desires; and (4) allowing minority discounts would encourage oppressive majority conduct.

Therefore, we conclude that the trial court properly determined that, under the circumstances of this case, a minority discount was not applicable as a matter of law.

 However, marketability discounts are treated differently. "[A] marketability discount may, in appropriate circumstances, be applied, but ... such a determination is a factual one that must be made on an *ad hoc*, case-by-case basis." *WCM Industries v. Trustees of Wilson Trust, supra*, 948 P.2d at 39. *WCM* sets forth some of the factors that may be considered in determining whether a marketability discount is appropriate. It emphasizes, however, that the court may consider any relevant factor.

Here, the trial court erred in rejecting a marketability discount as a matter of law. Therefore, the case must be remanded to the trial court to make findings of fact and to determine if a marketability discount applies under the pertinent facts here. If it does

apply, the trial court must reconsider the fair value of S & W's shares taking that factor into consideration. If the trial court determines that a marketability discount does not apply, then the judgment valuing S & W's shares is affirmed, subject to any appeal of that determination.

## C.

M Life next argues that the judgment does not comply with C.R.C.P. 52, because the trial court failed to explain how it weighed the various value factors used in reaching its determination. Except as to the court's findings the court's relating to the marketability discount, we are not persuaded.

"There is sufficient compliance with the rule if the ultimate facts have been determined and conclusions of law are entered thereon." *Manor Vail Condominium Ass'n v. Vail,* 199 Colo. 62, 68, 604 P.2d 1168, 1172 (1980).

Here, the trial court received several expert opinions placing the value of the corporation between $103 million and $209 million. It considered all the opinions and arrived at a value of $170 million. This determination of value did not adopt the value of any one expert; rather, it was the trial court's determination of value based on consideration of "all the evidence, different valuation methodologies, and different assumptions" of the expert witnesses. The determination of fair value is not susceptible to analysis by any precise mathematical formula, *Pioneer Bancorporation, Inc. v. Waters, supra,* and therefore, the weighing of the factors is qualitative as well as quantitative. As a fact finder, the trial court could accept or reject all or part of each witness' testimony. *Gordon v. Benson, supra.*

Since the trial court clearly indicated that it weighed all the relevant value factors and determined the ultimate facts, we are not persuaded that further findings are required, except as to the marketability discount.

## III.

M Life finally contends that the trial court erred by ordering it, pursuant to §§ 7–113– 302(2)(a) and 7–113–302(2)(b), C.R.S.2000, to pay S & W's "reasonable and necessary fees and expenses of counsel and experts." We dismiss this part of the appeal.

The judgment M Life has appealed includes an order assessing the fees and expenses against M Life, but does not contain a determination of the amount of those fees and expenses. The issue thus is whether this part of the judgment is a final and appealable order. We hold that it is not.

The entry of a final judgment is a prerequisite to the right to pursue an appeal. Interlocutory orders may not be reviewed without specific authorization by statute or rule. To constitute a final judgment, the trial court's ruling must dispose of the entire litigation on the merits, leaving nothing more to do but execute the judgment. *Mission Viejo Co. v. Willows Water District,* 818 P.2d 254 (Colo.1991). However, unresolved attorney fees issues do not impair the finality of the judgment on the merits. *Baldwin v. Bright Mortgage Co.,* 757 P.2d 1072 (Colo. 1988).

*Baldwin* makes it clear that the attorney fees issue is separately appealable from the judgment on the merits, but it "did not specify what is necessary for an attorney fee award to be final and appealable in its own right." *State Personnel Board v. Department of Corrections,* 988 P.2d 1147, 1152 (Colo.1999). *State Personnel Board* held that an order from the State Personnel Board, an administrative agency, determining entitlement to attorney fees without specifying an amount was a final and appealable order. However, in a footnote, the supreme court reserved judgment on the question as it relates to court-awarded attorney fees. Thus, *State Personnel Board* is not controlling here.

A division of this court has held that an award granting attorney fees, but not determining the amount, is not a final judgment. *Axtell v. Park School District R–3,* 962 P.2d 319 (Colo.App.1998). This holding is consistent with well-settled law that a judgment assessing liability without determining damages is not a final order. *Har-*

*ding Glass Co. v. Jones,* 640 P.2d 1123 (Colo. 1982); *Hyman & Co. v. Velsicol Corp.,* 119 Colo. 121, 201 P.2d 380 (1948); *Ball Corp. v. Loran,* 42 Colo.App. 501, 596 P.2d 412 (1979).

*Axtell* is also supported by considerations of judicial economy, because its holding prevents piecemeal appeals. *See Feiger, Collison & Killmer v. Jones,* 926 P.2d 1244 (Colo.1996)(holding that orders denying summary judgment are not appealable, based in part on the avoidance of piecemeal appeals).

Both parties urge us to consider the order for fees and expenses under § 7–113–302 as an appealable order because it is intertwined with the judgment on the merits. We agree there is overlap between these two issues, but this argument could be made in most, if not all, cases involving awards of attorney fees entered after judgment on the merits. If we accept this as a basis for departing from the general rule, the exception would swallow the rule. Also, we are reluctant to create special rules applicable in limited situations, because they can become traps for the unwary. Such an exception would diminish the clarity of the bright line rule established in *Baldwin.*

If we follow the rule in *Axtell,* there may be two appeals in some cases. *See Baldwin v. Bright Mortgage Co., supra.* But if we allow appeal of an order that only establishes entitlement to attorney fees and expenses, here may be three appeals: one based on the judgment on the merits, one based on entitlement to attorney fees and expenses, and one based on the amount of attorney fees and expenses. Therefore, we adhere to the rule in *Axtell* and dismiss the appeal without prejudice as it relates to the order requiring M Life to pay the attorney fees and expenses of S & W's attorneys and experts.

We note that a separate appeal concerning attorney fees and expenses is pending before this court in *M Life Insurance Co. v. Sapers & Wallack Insurance Agency, Inc.,* Colo. App. No.2000CA30. Briefing in that case has been continued pending resolution of this appeal. The parties may wish to include the issue of entitlement to such fees and expenses in that appeal.

* Justice COATS does not participate.

We also note that if the trial court determines that a marketability discount does apply, and if that discount substantially affects the trial court's determination of fair value, it may have some impact on the trial court's findings and conclusions on the fees and expenses issue. However, because we have dismissed this part of the appeal, we express no opinion on this issue.

### IV.

The appeal is dismissed as it relates to the assessment of fees and expenses of counsel and experts. The judgment valuing S & W's shares is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this opinion.

HUME, C.J., and TAUBMAN, J., concur.