**BUCKLEY POWDER CO.,** for itself and on behalf of similarly situated entities, Plaintiff–Appellee and Cross–Appellant,

v.

**STATE** of Colorado; Gale Norton, in her official capacity as Attorney General of the State of Colorado; Colorado Department of Revenue; Renny Fagan, in his official capacity as Executive Director, Department of Revenue; Dee Hartman, in his official capacity as Director, Division of Motor Vehicles, Department of Revenue; Larry D. Huls, in his official capacity as Assistant Director, Division of Motor Vehicles, Department of Revenue; and Jaki Berry, in her official capacity as Administrative Officer, Motor Carrier Services, Division of Motor Vehicles, Department of Revenue, Defendants–Appellants and Cross–Appellees.

No. 00CA2265.

Colorado Court of Appeals,
Div. V.

Dec. 19, 2002.

Certiorari Denied May 27, 2003.

Timmins & Associates, L.L.C., Edward P. Timmins, Jo Deziel Timmins, Denver, Colorado; King, Burke & Schaap, Thomas King, Salt Lake City, Utah; Richard C. Hutchison, Farmington, Utah, for Plaintiff–Appellee and Cross–Appellant.

Ken Salazar, Attorney General, Mark W. Gerganoff, Assistant Attorney General, Denver, Colorado, for Defendants–Appellants and Cross–Appellees.

Opinion by Judge WEBB.

In this tax refund class action, defendants, State of Colorado, Colorado Department of Revenue, and various state officials (collectively, the state), appeal from the trial court's judgment certifying damages classes under C.R.C.P. 23(b)(3) and creating a common fund for the recovery of unconstitutionally collected taxes. On cross-appeal, plaintiff, Buckley Powder Co., for itself and on behalf of similarly situated entities, contends the trial court erred in limiting fees of its attorneys to $250,000 under § 13–17–203, C.R.S. 2002, and also erred in its award of prejudgment interest. We affirm.

## I. Background

Buckley commenced this action challenging, as an unconstitutional burden on interstate commerce, amendments to Colorado's interstate and intrastate motor vehicle carrier registration fee and ownership tax statutes, Colo. Sess. Laws 1990, ch. 301, § 42–3–105(1)(a); Colo. Sess. Laws 1989, ch. 356, § 42–3–123(13)(b) & (b.3). Buckley sought class certification, injunctive and declaratory relief, and a refund of unconstitutional taxes collected between 1990 and 1994.

The trial court denied class certification, but granted Buckley's motion for summary judgment on the basis that the statutes, as amended, violated the Commerce Clause. The court denied Buckley's request for damages. Buckley appealed.

While its appeal was pending, the supreme court held that the amended statutes violated the Commerce Clause by differentiating between intrastate and interstate trucks as to both registration fees and ownership taxes. *Riverton Produce Co. v. State*, 871 P.2d 1213

(Colo.1994)(*Riverton* ). In response, the state instituted a refund program pursuant to § 39–21–108, C.R.S.2002.

Relying on *Riverton,* a division of this court concluded the sole remaining issue in Buckley's appeal was the trial court's refusal to certify a class. The division remanded the case and directed the trial court to reconsider class certification. *Buckley Powder Co. v. State,* 924 P.2d 1133 (Colo.App.1996)(*Buckley I* ).

The supreme court granted certiorari on the class certification issue, reversed in part, and remanded the case. *State v. Buckley Powder Co.,* 945 P.2d 841 (Colo.1997)(*Buckley II* ). The remand instructed the trial court to consider whether to certify a class pursuant to C.R.C.P. 23(b)(3) for the purpose of refunding the unconstitutionally collected taxes.

On remand, the trial court certified two classes—interstate carriers who had paid registration fees between 1990 and 1994 on trucks driven less than 30,000 miles nationally (class II), and interstate carriers who had paid ownership taxes between 1990 and 1994 on trucks ten years old or older when registered (class III). These classes differed slightly from the classes initially proposed by Buckley. The trial court then appointed a special master to evaluate a common fund remedy and later adopted the special master's recommendation concerning creation of a common fund.

After a trial on damages, the court awarded common fund damages of $5,808,702 for class II and $320,588 for class III, to be paid through a refund of taxes otherwise payable in the current tax year using a plan to be developed by the court-appointed claims administrator.

The trial court limited fees of Buckley's attorneys to $250,000, the maximum under § 13–17–203, and awarded prejudgment interest only from 1995 to the date of judgment. Before the claims administrator presented a plan, the trial court certified the judgment as final under C.R.C.P. 54(b).

## II. Priority of Statutory Refund Procedure

 The state first argues the trial court could not certify a class pursuant to C.R.C.P. 23 because the state's "opt-in" refund program established by § 39–21–108 conflicts with a class action opt-out procedure under C.R.C.P. 23, and under C.R.C.P. 81(a) a specific statutory procedure prevails over a conflicting rule of civil procedure. We do not agree.

Even if we assume, without deciding, that the conflict posited by the state exists, nevertheless both *Buckley I* and *Buckley II* held the trial court erred in finding the statutory refund scheme to be the exclusive means for refunding taxes collected under the unconstitutional tax statutes. The division agreed with Buckley that "it is the obligation of the trial court, after declaring the collected tax unconstitutional, to provide it with a remedy." *Buckley I,* 924 P.2d at 1136. Similarly, the supreme court concluded the trial court must consider a damages class under C.R.C.P. 23(b)(3) because the state does not have an "unfettered right to determine an appropriate remedy free from any judicial approval or supervision." *Buckley II,* 945 P.2d at 848. Moreover, the opinions do not indicate that the state raised the C.R.C.P. 81(a) conflict issue before either court.

Hence, we reject the state's argument that the existence of this statutory scheme precludes class relief under C.R.C.P. 23(b)(3).

## III. Class Certification

 The state next argues the trial court erred in certifying the classes pursuant to C.R.C.P. 23(b)(3) because common issues of law or fact do not predominate and because a class is not the superior way to refund the unconstitutionally collected taxes. We disagree.

C.R.C.P. 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate" and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

The trial court made detailed findings supporting class certification on both predominance and superiority grounds.

## A. Predominance

In our view, the supreme court assumed predominance was already decided and consequently its remand instructions limited the trial court to considering superiority.

While recognizing that C.R.C.P. 23(b)(3) certification "is appropriate for classes seeking primarily monetary damages," the supreme court instructed that on remand the trial court should determine whether the proposed classes meet the superior method requirement of C.R.C.P. 23(b)(3). *Buckley II, supra,* 945 P.2d at 845, 848. In contrast to the multiple references to superiority, the remand instructions did not mention predominance.

Moreover, the predominance prong of the C.R.C.P. 23(b)(3) inquiry usually involves liability, not damages. *See* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* §§ 4.24–4.26 (3d ed.1992). Here, *Riverton* has resolved liability. *Buckley II, supra,* 945 P.2d at 843.

Accordingly, we need not address the trial court's predominance analysis and instead focus our review on the trial court's finding of superiority.

## B. Superiority

The state next asserts the trial court erred in determining that class treatment would be superior to the state's refund program because the trial court mistakenly found deficiencies in the refund program. We are not persuaded.

The fact intensive superiority inquiry seeks to determine the best mechanism for identifying claimants and processing their claims. *See* Newberg, *supra,* §§ 4.27, 4.44 (the superiority requirement of rule 23(b)(3) entails a comparison of a class action to other available remedies and a determination of which procedure would achieve the fairest and most efficient adjudication of the controversy).

The party advocating class certification bears the burden of proof. *Villa Sierra Condo. Ass'n v. Field Corp.,* 787 P.2d 661 (Colo.App.1990). The decision to certify a class action lies within the trial court's dis-

cretion and will be affirmed unless clearly erroneous or an abuse of discretion. *Friends of Chamber Music v. City & County of Denver,* 696 P.2d 309 (Colo.1985).

Under C.R.C.P. 23(b)(3), the trial court has broad discretion in determining whether class certification is the superior means of adjudication. Nevertheless, if the parties could obtain the same relief without class certification, then a class is not the superior method as required by C.R.C.P. 23(b)(3), and certification should be denied. *Buckley II, supra.*

The need for some proof of individual damages does not preclude certification under C.R.C.P. 23(b)(3). Fed.R.Civ.P. 23 advisory committee note; *see Toothman v. Freeborn & Peters,* —— P.3d ——, 2002 WL 31600861 (Colo.App. No. 01CA1142, Nov. 21, 2002). A class can prove its aggregate damages, thus making class certification appropriate, and then the court can appoint a master or magistrate to preside over individual damage proceedings. *See* Newberg, *supra,* § 4.26.

Here, in remanding the case to determine whether class certification was the superior method, the supreme court noted, "An adequate [statutory] refund program is certainly relevant to the trial court's decision ...." *Buckley II, supra,* 945 P.2d at 848. Thus, the superiority inquiry involves comparison of the state's refund program to recovery through a class action.

On remand, the trial court found the state's refund program inadequate primarily because the state required all claimants to prove not only that they had paid the unconstitutional differentials, but also the amount of the differentials paid. The trial court concluded this scheme wrongfully put the entire risk of inadequate information on the claimants. The trial court rejected the state's assertion it could not have filled gaps in its information, finding the state could have requested carrier records from other jurisdictions in which carriers had registered their trucks.

The trial court further found the refund program deficient because the state's refund packets, sent to carriers who had telephoned in response to refund announcements after

the decision in *Riverton,* did not distinguish between refunds for ownership taxes and refunds for registration fees or between Colorado based and non-Colorado based carriers as to registration fees. The trial court noted the state had substantial information on carriers who had paid ownership taxes and had some information on Colorado-based carriers as to registration fees, but had minimal information about non-Colorado carriers. Thus, the trial court found it highly probable that carriers owed refunds for the ownership tax differential, often less than ten dollars per truck per year, had been unnecessarily deterred from requesting a refund by the comprehensive proof the state demanded.

The trial court also contrasted the benefit of greater finality that would result from an opt-out C.R.C.P. 23(b)(3) class with the opt-in nature of the refund program, which would leave open the possibility of numerous lawsuits.

Based on these findings, the trial court certified the following two classes:

(1) Class II: All owners of trucks or tractor trailers, operated in interstate commerce which were registered to travel in Colorado beginning January 1, 1990, and which traveled less than 30,000 miles nationally in any year;

(2) Class III: All owners of trucks, tractor trailers or trailers, operated in interstate commerce, which were registered to travel in Colorado from January 1, 1990 through the date of the filing of the complaint (January 26, 1993), and which were ten years old when registered.

The state challenges the trial court's analysis, asserting that it is not required to maintain records identifying carriers who pay registration fees and ownership taxes, while carriers have this responsibility under the international registration program (IRP), §§ 42–1–102(76) and 42–3–103(2), (3), C.R.S. 2002.

IRP allows a carrier to register trucks annually in its base jurisdiction and pay a single annual registration fee and ownership tax to that jurisdiction. The base jurisdiction then rebates a portion of the payment to each jurisdiction in which a truck operates, prorated according to mileage traveled in that jurisdiction as reported by the carrier to the base jurisdiction. According to the state, the trial court's ruling erroneously allows carriers to enjoy the benefits of IRP without the burden of using their mileage records, which they must maintain because of possible audit under IRP, to obtain payment under the refund program.

The state further contends carriers were not misled by the refund packets, but were uninterested in obtaining a refund, emphasizing that only 48 carriers requested compensation after the state announced its willingness to make refunds and sent out 1,440 refund packets in response to telephone inquiries from carriers.

Here, the record supports the trial court's findings concerning deficiencies in the state refund program. The refund packets sent out by the state show the problems identified by the trial court. The discrepancy between 1,440 packets sent in response to "thousands" of telephone inquiries from carriers and 48 responses suggests that the packets were confusing and dissuaded some carriers from pursuing relatively small claims.

We therefore conclude the trial court did not abuse its discretion in certifying the two classes.

### IV. Redefinition of the Classes

The state next contends that even if certification was proper, the trial court erred in redefining the classes because it thereby undermined the evidence in the initial proceeding concerning satisfaction of the C.R.C.P. 23(a) requirements involving class II and exceeded the scope of the remand. We disagree.

C.R.C.P. 23(c) and (d) empower the trial court to restructure a class to ensure appropriate treatment of class issues. The trial court may change a class either on its own motion or at the request of a party. *Goebel v. Colo. Dep't of Insts.,* 764 P.2d 785 (Colo.1988); *Elk River Assocs. v. Huskin,* 691 P.2d 1148 (Colo.App.1984).

In *Buckley II,* the supreme court concluded the trial court had "determined that Buckley had proven the requirements of C.R.C.P.

23(a)." *Buckley II, supra,* 945 P.2d at 844 n. 2. The remand was to consider "whether to certify a class under C.R.C.P. 23(b)(3)." *Buckley II, supra,* 945 P.2d at 848.

During the hearing on class certification, the parties discussed the fact that the classes, as originally defined, no longer accurately reflected the classes of aggrieved taxpayers in light of *Riverton.* Originally, class II had a beginning membership date of June 1, 1989, and included carriers who traveled less than 30,000 miles in Colorado. Class III had a beginning membership date of April 16, 1990.

The trial court made three modifications to the class definitions: Class II would include carriers who traveled less than 30,000 miles nationally, instead of less than 30,000 miles in Colorado, because *Riverton* held that the registration fee was unconstitutional as to carriers who traveled less than 30,000 miles nationally; the class II beginning membership date was changed from June 1, 1989, to January 1, 1990, because the amendments became effective on the later date; and the class III beginning membership date was changed from April 16, 1990, to January 1, 1990, because the ownership tax amendment was retroactive.

The trial court determined that its restructuring of the classes neither exceeded the scope of remand nor reopened inquiry into the C.R.C.P. 23(a) requirements. In the alternative, the court found class II still met the numerosity requirement.

The state cites no authority limiting a trial court's discretion to restructure a class under C.R.C.P. 23(c) and (d) in proceedings on remand. Here, the reasons for the court's redefinition exemplify the sometimes necessary exercise of this power. Hence, we conclude the trial court did not exceed the scope of the remand or abuse its discretion.

The nature of the trial court's modifications to the classes could not change the initial determination concerning the C.R.C.P. 23 requirements of commonality, typicality, and adequacy. While the trial court acknowledged that, as modified, class II might now be smaller, the court's alternative finding that class II was still numerous, based on the widespread response of carriers to announcements of the state refund program, enjoys record support. Hence, we further conclude the trial court's restructuring did not reopen the case for further proceedings under C.R.C.P. 23(a).

Accordingly, we discern no error in the trial court's restructuring of the classes.

## V. Motion to Decertify

The state next argues the trial court erred in denying its motion to decertify the classes and dismiss class members because a significant number of carriers who had received class action notices opted out and because the class members' claims were time barred. We reject both contentions.

### A. Carriers Who Opted Out

■■■ In its motion to decertify, the state did not raise the issue of the number of carriers who had opted out. We do not normally consider arguments for reversal raised for the first time on appeal. *See Matthews v. Tri–County Water Conservancy Dist.,* 200 Colo. 202, 613 P.2d 889 (1980). In any event, the record supports Buckley's explanation that class action notices were mailed to all carriers currently operating in Colorado, a larger group than the class of carriers operating in Colorado during 1990 through 1994, and that some carriers opted out because they did not consider themselves to be class members.

Accordingly, we decline to reverse the class certification decision on this basis.

### B. Statute of Limitations

[9] The state also contends the class members' action is time barred based on their failure either to bring their own separate actions or to intervene in this case, following the trial court's refusal to certify the same or similar classes in *Riverton,* which aspect of that case was not appealed. The state relies on the two-year statute of limitations, set forth in § 13–80–102(1)(h), C.R.S.2002, and argues that because of the similarity between classes, this action did not toll the statute as to the putative class. We

reject this argument as barred by the law of the case.

In *Buckley I*, the state withdrew its cross-appeal of the trial court's adverse ruling on this issue. Nevertheless, the state now argues it was not foreclosed from raising this issue in its motion to decertify because *Basch v. Ground Round, Inc.*, 139 F.3d 6 (1st Cir. 1998), decided after *Buckley II*, changed the law of tolling where successive actions seek certification of the same class. We are not persuaded.

■ We generally adhere to the law of the case doctrine, which protects parties from relitigating settled issues and ensures lower courts follow decisions of higher courts in later proceedings. *Super Valu Stores, Inc. v. Dist. Court*, 906 P.2d 72 (Colo.1995). This doctrine applies to both appellate court rulings on remand and rulings of a trial court in further trial court proceedings. *Kuhn v. State*, 897 P.2d 792 (Colo.1995). It gives preclusive effect to decisions involving the same parties in the same case. *S.O.V. v. People in Interest of M.C.*, 914 P.2d 355 (Colo.1996); *Gavend v. Malman*, 946 P.2d 558 (Colo.App.1997).

■ In its discretion, a court may decline to follow the law of the case when the former ruling would result in manifest injustice or is no longer sound because of changed conditions, a legal or factual error in a prior ruling, or an intervening change in the law. *Perez v. Witham*, 1 P.3d 262 (Colo.App.1999).

■ However, disregarding the law of the case based on an intervening change in the law requires a significant change in controlling law made by a higher court or by statute. *See Grigsby v. Barnhart*, 294 F.3d 1215 (10th Cir.2002); *United States v. Platero*, 72 F.3d 806 (10th Cir.1995); *Straight v. Wyo. Dep't of Transp.*, 248 B.R. 403 (B.A.P. 10th Cir.2000). Courts presume case law to be in constant flux and are reluctant to reopen decided issues based on changes in decisional law alone. *Cf. Davidson v. McClellan*, 16 P.3d 233 (Colo.2001).

Here, the trial court's initial ruling rejecting the statute of limitations argument became the law of the case. On remand, the trial court held it lacked authority to reconsider this issue because *Buckley II* limited the remand to consideration of C.R.C.P. 23(b)(3) and, alternatively, held certification was timely.

■ We decline to deviate from the law of the case because *Basch v. Ground Round, Inc., supra*, does not represent a change in the controlling law. *Basch*, a decision of the United States Court of Appeals for the First Circuit, is not binding precedent in Colorado state courts. Lower federal courts have no jurisdiction over state courts, and their decisions, even on federal law, do not bind Colorado state courts. *Hill v. Thomas*, 973 P.2d 1246 (Colo.1999), *aff'd*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *People v. Barber*, 799 P.2d 936 (Colo.1990).

Moreover, *Basch* did not constitute a significant change in the law because the court only extended older circuit court decisions on tolling of successive Fed.R.Civ.P. 23 class actions to the Age Discrimination in Employment Act, 29 U.S.C. § 621, which employs the "collective action" procedures of the Fair Labor Standards Act, 29 U.S.C. § 216, rather than Rule 23. *Basch v. Ground Round, Inc., supra*, 139 F.3d at 11 (collecting cases).

We also agree with the trial court that nothing in the remand contemplates further litigation of a defense to class certification, as opposed to considering "whether to certify a class under C.R.C.P. 23(b)(3) for purposes of providing a remedy for the damages claim arising from the unconstitutional taxation." *Buckley II, supra*, 945 P.2d at 848.

Accordingly, we conclude the trial court did not err in denying the state's motion to decertify.

## VI. Common Fund Remedy

The state next contends the trial court erred by ordering a common fund remedy because here a common fund does not serve the policy objectives behind this remedy and because the amount in the common fund is not based on competent evidence. We disagree.

## A. Policy Issues

■ We first reject the state's argument that a common fund is not appropriate here because the policy behind common fund remedies is to deny defendants the fruits of their wrongdoing. According to the state, it has spent the unconstitutional taxes at issue for various public purposes, including projects that benefit carriers, and does not hold any ill-gotten gains.

The state cites no case declining to employ a common fund remedy against a governmental entity for the policy reason it argues. To the contrary, in *Kuhn v. State, supra*, the supreme court approved a tax refund payable by the state from a common fund. *See also Sholer v. State ex rel. Dep't of Pub. Safety,* 990 P.2d 294 (Okla.Civ.App.1999)(class certification was the superior method for refunds to drivers who paid multiple driver's license reinstatement fees).

Moreover, the state's argument would preclude most damages class actions against governmental entities, including actions to recover wrongfully collected taxes, because a governmental entity typically does not retain tax collections beyond the current tax year, within which the collected amounts are usually expended to further the public interest. Even if some carriers who stand to receive refunds as class members have already benefited from projects on which the unconstitutional taxes were spent, the state has not shown the benefit to be proportional to the wrongfully assessed taxes.

Hence, we discern no public policy that precludes a common fund in this case.

## B. Amount in the Common Fund

■ We also reject the state's arguments that the amount in the common fund is not based on competent evidence and instead resulted from the special master's bias in favor of a common fund to assure his own compensation. .

## 1.

Contrary to the state's challenge, the common fund award is supported by sufficient evidence.

■ As fact finder, the trial court has the sole province to determine the amount of damages, and we will not set aside the award unless it is clearly erroneous. *Kincaid v. W. Operating Co.,* 890 P.2d 249 (Colo.App.1994).

■ The trial court must examine the facts of the case and award damages that provide fair, adequate, and equitable relief, which cannot be based only on speculation or conjecture. *Sonoco Prods. Co. v. Johnson,* 23 P.3d 1287 (Colo.App.2001). However, when the evidence would support both a higher amount and a lower amount of damages than that awarded by the trial court, we presume the award is correct. *McDonald's Corp. v. Brentwood Ctr., Ltd.,* 942 P.2d 1308 (Colo.App.1997).

■ When the fact of damage has been established, the law does not require certainty as to the amount. *W. Cities Broad., Inc. v. Schueller,* 849 P.2d 44 (Colo.1993). Here, *Riverton, supra,* established the fact of damage.

■ Statistical estimates enjoy wide acceptance when courts grapple with complex damage issues. *In re Dow Corning Corp.,* 211 B.R. 545 (Bankr.E.D.Mich.1997). Statistical experts often present conflicting approaches. *McNeil–P.P.C., Inc. v. Bristol–Myers Squibb Co.,* 755 F.Supp. 1206 (S.D.N.Y.1990), *aff'd,* 938 F.2d 1544 (2d Cir. 1991). Hence, appellate courts defer to the finder of fact regarding statistics.

Nevertheless, the state asserts that in estimating class II damages, the special master wrongly relied on census tables as opposed to raw data, mistakenly treated vehicle weight and mileage as independent variables, erroneously used lower confidence limits to compensate for nonsampling errors, and included in his calculations certain low-mileage trucks that he had admitted in deposition should be excluded.

Buckley defends the amount of the common fund on the basis that the trial court expressly considered each of the state's arguments and accordingly reduced the special master's estimate of over $18,000,000 to the $5,808,702 awarded.

■ Neither party has included a transcript of the damages trial. When the party seeking reversal fails to provide a transcript of the proceedings, an appellate court must presume the evidence supports the trial court's decision. *See Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242 (Colo.1994).

■ The special master and the state's expert were qualified experts in statistical analysis. They submitted reports that reached different conclusions using different methodologies both before and after the damages trial. When qualified experts disagree about the exact measure of damages, we defer to the trial court. *Cf. Stone v. Caroselli*, 653 P.2d 754 (Colo.App.1982).

Statistical damages models are by definition estimates, and while the trial court found persuasive some criticisms of the special master's methodology, it did not find the special master's approach to be fatally flawed. *Cf. People v. Shreck*, 22 P.3d 68 (Colo.2001). Nevertheless, the court made significant reductions to the special master's conclusion concerning class II damages because the special master relied on census data without using raw data to separate intrastate from interstate vehicles, treated weight as independent of mileage, and failed to exclude trucks driven less than 2,500 miles.

Although the court did not detail how it arrived at the specific amounts of these adjustments, the court noted that the position of the state's expert was "extremely aggressive" and that the special master's estimate was "substantially lower" than an estimate in an earlier affidavit of the state's primary witness. Based on our review of the various expert reports, and in the absence of a transcript from the damages trial, we conclude the trial court's class II adjustments were not clearly erroneous. *See M Life Ins. Co. v. Sapers & Wallack Ins. Agency*, 40 P.3d 6 (Colo.App.2001).

The trial court made no adjustment to the special master's estimate concerning class III damages, noting that the estimate was within the ninety-five percent confidence level agreed on by the parties. This confidence level enjoys wide legal acceptance. *Davis v. N.Y. City Hous. Auth.*, 278 F.3d 64 (2d Cir.

2002); *In re Estate of Marcos Human Rights Litig.*, 910 F.Supp. 1460 (D.Haw. 1995), *aff'd*, 103 F.3d 767 (9th Cir.1996). Nor did the trial court clearly err in finding the special master's use of the midpoint on the ownership fee schedule "entirely reasonable . . . under the time and costs constraints under which he was working."

Accordingly, we uphold the trial court's determination of the common fund amount.

### 2.

■ The state also contends the amount in the common fund is erroneous because the special master's compensation involved a de facto contingency arrangement based on payment from a common fund and therefore biased his conclusions. We disagree.

■ An expert witness should not receive a contingent fee because the expert may thereby be improperly motivated to enhance his or her compensation and thus lose objectivity. *City & County of Denver v. Bd. of Assessment Appeals*, 947 P.2d 1373 (Colo. 1997).

First, the amount of the special master's fee was not contingent. Initially, he was paid by the judicial department pursuant to C.R.C.P. 53(a), on an hourly basis, but subject to a maximum charge of $70,000. Thus, the amount of his compensation did not depend on his conclusion.

Second, the special master's compensation did not become contingent on the existence of a common fund after the trial court ordered that the state begin paying him. Under the court's order, the state would receive a credit for payments against the common fund. However, had the trial court ultimately ruled against a common fund, either the special master would already have been paid or the court could have used C.R.C.P. 53(a) to order that the judicial department pay any remaining balance. Moreover, during the last hearing on use of a common fund, the state acquiesced in the trial court's proposal that the state advance compensation.

We thus decline to disturb the common fund on appeal.

## VII. Costs of the State

■ We reject the state's argument for recovery of its reasonable costs under § 13–17–202, C.R.S.2002.

Section 13–17–202(1)(a)(II), C.R.S.2002, requires a plaintiff to pay the defendant actual costs if the defendant offers, at least ten days before trial, to settle with the plaintiff and the plaintiff recovers less than the settlement offer at final judgment.

Here, the state admits it would not be entitled to recover costs if we affirm the trial court's class damages award because the state only offered to settle with Buckley individually.

Because we have affirmed the trial court's class certification and damages award, we conclude the state is not entitled to its actual costs under § 13–17–202(1)(a)(II).

## VIII. Buckley's Attorney Fees

On cross-appeal, Buckley first contends the trial court erred in imposing the $250,000 attorney fees cap under § 13–17–203 because the statute does not apply here and is unconstitutional. We disagree.

### A. Application of § 13–17–203

■ We reject Buckley's argument that the trial court erred when it limited attorney fees based on § 13–17–203.

■ Statutory interpretation is a question of law that we review de novo. *Colo. State Bd. of Accountancy v. Paroske*, 39 P.3d 1283 (Colo.App.2001).

■ When interpreting a statute, our primary responsibility is to determine the intent of the General Assembly. *People v. Cooper*, 27 P.3d 348 (Colo.2001). We begin with the statute's language, which we afford its ordinary and common meaning. We construe statutes as a whole, give effect to every word, and resist forced or strained constructions. *Bd. of County Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263 (Colo.2001).

■ If a separate clause within a statute can be reconciled using one interpretation but would conflict under another, we adopt the interpretation allowing for consistency.

*People v. Dist. Court*, 713 P.2d 918 (Colo. 1986).

■ We look to legislative history and other extrinsic factors only if the statute is ambiguous or portions of the statute may conflict. *People v. Cooper, supra.*

Section 13–17–203 provides:

> If the plaintiffs prevail in any class action litigation brought against any public entity ... the amount of attorney fees which the plaintiffs' attorney is entitled to receive out of any award to the plaintiffs shall be determined by the court; except that such amount shall not exceed two hundred fifty thousand dollars. Such limitation shall apply where the public entity pays the attorney fees directly to the plaintiffs' attorneys or where the public entity is required to pay the attorney fees indirectly through any program it administers by reducing the benefits or amounts due to the individual plaintiffs.

We perceive no ambiguity in this language. The statute applies to attorney fees in "any class action" against "any public entity," which includes the state. Buckley brought a successful class action that resulted in a judgment against the state and obtained an attorney fees award.

Nevertheless, Buckley challenges application of the statute because here the state does not, as required by the second sentence, directly pay the attorney fees or administer any program that indirectly pays the fees, in that the trial court appointed a claims administrator to distribute the common fund. We are not persuaded.

The "direct payment" clause describes the public entity's use of general revenues either to pay the attorney or to create a common fund from which the attorney is then paid. The "indirect payment" clause describes partial use of class members' benefits from a public program to compensate the attorney for the class. Thus, the latter clause encompasses traditional government functions, such as increasing payment under an entitlement program, granting a tax credit, or refunding an assessment.

Here, the common fund, after payment of administration expenses, the $250,000 in attorney fees, costs, and individual refund claims, will be credited against future ownership taxes and registration fees. The claims administrator could not perform his role in the refund program unless the state generates the annual registration fee and ownership tax bills that will be the mechanism for credits, based on the claims administrator's identification of class members. And ultimately, only the state can adjust class members' tax liability to create the necessary credits.

Buckley's assertion that the refund program is not administered by the state would distinguish between two otherwise identical refund programs, depending only on whether state employees or a claims administrator handled the details. However, the "indirect payment" clause protects class claimants from dilution of their awards by payment of attorney fees exceeding the cap, as discussed more fully below concerning equal protection. This concern is no different whether a claims administrator handles certain aspects of distribution or state personnel handle the entire distribution process.

Thus, we conclude the mechanism for compensation in this case is a program administered by the state.

Furthermore, to the extent that Buckley commenced this litigation with the expectation that its counsel would receive compensation either directly from the state or through a common fund, Buckley must have recognized that compensation would be subject to § 13–17–203. The statute was enacted in April 1992, before commencement of this action. *See Kuhn v. State, supra.*

Accordingly, we further conclude the trial court correctly applied § 13–17–203 to the facts of this case.

### B. Constitutionality

Buckley next argues § 13–17–203 is unconstitutional because it deprives certain class litigants of equal protection of the law and equal access to the courts. We disagree.

 Statutes are presumed to be constitutional, and the party challenging a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt. *Kibler v. State,* 718 P.2d 531 (Colo.1986); *Spradling v. Colo. Dep't of Revenue,* 870 P.2d 521 (Colo.App.1993).

### 1.

 Buckley first contends § 13–17–203 violates the equal protection guarantees of the Unites States and Colorado Constitutions because the statute treats similarly situated persons differently. This contention is unavailing.

 Equal protection of the law requires the government to treat similarly situated persons in a like manner. *Rodriguez v. Schutt,* 914 P.2d 921 (Colo.1996). Distinctions between classes or groups must be relevant to the purpose of the classification. *Tassian v. People,* 731 P.2d 672 (Colo.1987). Thus, a party raising an equal protection claim must show the challenged classification arbitrarily singles out a group of persons for disparate treatment and does not subject other similarly situated persons to this treatment. *Christie v. Coors Transp. Co.,* 933 P.2d 1330 (Colo.1997).

Buckley argues § 13–17–203 effectively creates two similarly situated groups that are treated differently. On the one hand, persons subject to illegal state action who have limited resources and individually small claims can obtain relief only by bringing a class action and cannot pay counsel directly. On the other hand, persons subject to the same illegal state action who have sufficient economic resources or large enough claims can seek individual relief. Further, according to Buckley, § 13–17–203 impacts these two groups differently in that only counsel to the former group may be deterred from accepting the representation at all or may be a less vigorous advocate because of the fee cap.

Buckley does not specify whether it challenges the statute on its face or as applied. Under either approach, we conclude § 13–17–203 is rationally related to a legitimate state interest.

 Because the statute does not either involve a suspect classification or infringe a

fundamental right triggering strict scrutiny, we use the rational basis test. *See Christie v. Coors Transp. Co., supra.* We presume statutory classifications subject to the rational basis test are constitutional. *Christie v. Coors Transp. Co., supra.*

A statutory classification satisfies this test when disparate treatment is based on real, not illusory, differences, and the classification reasonably relates to a legitimate state interest. *Tassian v. People, supra.* If any reasonably conceivable set of facts would establish a rational relationship between the classification and a legitimate purpose, then we must presume those facts exist. *Colo. Soc'y of Cmty. & Institutional Psychologists, Inc. v. Lamm,* 741 P.2d 707 (Colo.1987).

When a statute is challenged as violating equal protection because it treats two groups differently, the threshold question is whether those two groups are similarly situated. Unless they are similarly situated, the equal protection guarantee is not implicated. *Christie v. Coors Transp. Co., supra.*

Initially, we are not persuaded Buckley has identified similarly situated groups. The attributes that underlie Buckley's equal protection challenge—differences in economic resources and variation in size of claims—show precisely the opposite. *See In re R.A.,* 66 P.3d 146, 2002 WL 31120865 (Colo.App. No. 01CA1739, Sept. 26, 2002). These differences, not a statutory classification, explain why one group pursues a common fund recovery through a class action and is therefore subject to the attorney fees cap, while the other group may choose not to do so.

Even if we treat the groups framed by Buckley as similarly situated because they are both aggrieved by the same state conduct and are seeking similar redress, we still conclude the classifications serve legitimate state interests and are rationally related to those interests.

Buckley does not dispute that the first sentence of the statute shows the General Assembly acted to protect state funds from attorney fees awards, and preservation of state funds is a legitimate state interest. *See, e.g., State v. DeFoor,* 824 P.2d 783 (Colo.1992)(limitation on damages payable by the state); *Davis v. Paolino,* 21 P.3d 870 (Colo.App.2001). Nevertheless, Buckley argues § 13–17–203 is not rationally related to protecting state funds as applied here because the class members are paying the attorney fees from the common fund otherwise distributable to them, and hence state funds are not diminished by the amount of attorney fees paid, and also because the $250,000 cap is an arbitrary number.

We agree that payment to counsel by reducing class members' benefits from a common fund does not implicate the need to protect state funds. However, the statute also protects class members' net recovery from dilution through payment of attorney fees. The state has broad discretion to protect public health, safety, and welfare, *see People v. Zinn,* 843 P.2d 1351 (Colo.1993), which is a legitimate state interest. *See Robertson v. City & County of Denver,* 874 P.2d 325 (Colo.1994).

Other courts have similarly rejected challenges to legislative attorney fees caps on equal protection grounds using the rational basis test. *See, e.g., DiFilippo v. Beck,* 520 F.Supp. 1009 (D.Del.1981)(cap on attorney fees in medical malpractice cases upheld); *Mieras v. Dyncorp,* 122 N.M. 401, 925 P.2d 518 (N.M.Ct.App.1996)(cap on attorney fees in workers' compensation cases; collecting cases).

Buckley's assertion that the $250,000 cap is an arbitrary figure, unrelated to the reasonableness of class counsel's efforts, is unavailing. Equal protection guarantees do not impose significant restraints on governmental action in the area of economic and social welfare. *See Scholz v. Metro. Pathologists, P.C.,* 851 P.2d 901 (Colo.1993); *Sears v. Romer,* 928 P.2d 745 (Colo.App. 1996). Hence, a statute does not violate the equal protection guarantee because its classifications are imperfect. *Bellendir v. Kezer,* 648 P.2d 645 (Colo.1982). An award of $250,000 would be significant, and we cannot say that this limitation is beyond the province of the General Assembly.

Although § 13–17–203 limits attorney fees awards only in class actions, rather than in

all litigation against public entities, a statutory classification does not violate equal protection merely because it is underinclusive and fails to provide a complete remedy for the state interest addressed. Legislation may provide a remedy for a portion of the problem while neglecting other portions. *See Allstate Ins. Co. v. Feghali,* 814 P.2d 863 (Colo.1991); *Colo. Dog Fanciers, Inc. v. City & County of Denver,* 820 P.2d 644 (Colo. 1991).

Hence, we conclude § 13–17–203 is rationally related to the legitimate state interest of protecting class members' recovery for unlawful governmental action and does not violate the equal protection guarantees of the United States and Colorado Constitutions.

### 2.

■ We also reject Buckley's argument that § 13–17–203 unconstitutionally denies access to the courts to class claimants who can pay their counsel only out of a common fund.

The Colorado Constitution guarantees equal access to the courts. Colo. Const. art. II, § 6. The right is also recognized as a component of the federal constitutional guarantees of due process and the right to petition the government for redress of grievances. *Collins v. Jaquez,* 15 P.3d 299 (Colo. App.2000).

■ The guarantee of equal access requires that, if a right accrues under the law, then the courts must be available to effectuate that right. *Sears v. Romer, supra.* However, only some level of access to the judicial process is required, and limitations on access to courts are generally upheld if the burden is reasonable. *See Firelock Inc. v. Dist. Court,* 776 P.2d 1090 (Colo.1989)(reviewing permissible burdens on access to courts).

Here, even if we assume that the statutory cap imposes some burden on class claimants, persons aggrieved by state action still may sue, either individually or as a class. Hence, the assumed burden is no greater than those burdens allowed in *Firelock, supra.* Moreover, we have held that § 13–17–203 reasonably furthers legitimate state interests.

Accordingly, we conclude that § 13–17–203 does not deny equal access to the courts.

### IX. Prejudgment Interest

■ Buckley finally argues the trial court erred in denying prejudgment interest for 1990 to 1994. We disagree.

■ The finder of fact must determine issues of sufficiency, credibility, and weight of evidence. *See Cottonwood Hill, Inc. v. Ansay,* 709 P.2d 62 (Colo.App.1985). We defer to those findings and will not reverse them unless they are so clearly erroneous as to find no support in the record. *See Peterson v. Ground Water Comm'n,* 195 Colo. 508, 579 P.2d 629 (1978).

Section 39–21–110(1), C.R.S.2002, provides for interest on refunds for overpayment of taxes from the date of overpayment to not more than thirty days before the refund. Section 39–21–110.5(2), C.R.S.2002, sets the interest rate at "the prime rate, as reported by the 'Wall Street Journal,' plus three points, rounded to the nearest full percent." Hence, these issues are not within the trial court's customary discretion concerning an award of prejudgment interest. *See, e.g., Sartore v. Buder,* 759 P.2d 785 (Colo.App. 1988), *aff'd,* 774 P.2d 1383 (Colo.1989).

■ A plaintiff bears the burden of proof on both the fact and the amount of damages. *See, e.g., W. Cities Broad. Inc. v. Schueller, supra.* Interest is a component of a damage award.

Here, prior to the damages trial, the parties submitted briefs that included argument on the rates of prejudgment interest, but not on the yearly amount of unconstitutional tax to which those rates would be applied. Similarly, only the interest rates were mentioned in the parties' posttrial briefs. Lacking a transcript of the damages trial, we presume the evidence and argument on interest during the trial to be consistent with the trial court's order and judgment. *See Hock v. N.Y. Life Ins. Co., supra.*

The trial court's order and judgment did not allocate the total damages award by year between 1990 and 1994. As concerns prejudgment interest, the trial court acknowl-

edged the controlling interest statutes and noted the state did not dispute Buckley's calculation of applicable interest rates from 1990 to 2000.

The court found that Buckley had failed to satisfy its burden of proving "how much of the overpayments were suffered in each year" and observed that if this information were in the special master's reports, the court "was unable to extract it." Hence, the court awarded prejudgment interest only from January 1, 1995, to the date of judgment.

We conclude the record supports this determination, although we recognize that until entry of the order and judgment, Buckley could not have known the amount of damages that would be awarded for each year.

 Buckley's C.R.C.P. 59(a) motion requested the trial court to amend its findings and judgment by awarding interest for the years 1990 to 1994. The motion directed the court to a table in the special master's November 1, 1999, report from which Buckley asserted the percentage of total overpayment could be determined for each year, and those percentages could then be applied to the court's damage award, yielding annualized damage figures to which the interest percentages should be applied. The trial court denied Buckley's motion without explanation.

We review the trial court's decision to amend its findings, reopen the proceeding, or grant a new trial pursuant to C.R.C.P. 59(a) for an abuse of discretion. *Goodwin v. Eller*, 127 Colo. 529, 258 P.2d 493 (1953); *see also Bushner v. Bushner*, 141 Colo. 283, 348 P.2d 153 (1959)(trial court has even greater discretion to grant or deny relief under C.R.C.P. 59(a) when the proceedings were a trial to the court instead of a jury trial).

In opposition to Buckley's C.R.C.P. 59(a) motion, the state argued the cited portions of the special master's report would not allow the trial court to calculate damages from 1990 to 1994 because this information did not establish the number of class members and the approximate size of their claims in each year, but instead assumed that overpayments by class members were directly proportional to overpayments by all carriers. Buckley

responded with additional references to the special master's 1999 report and a source on which he relied to support the assumption of proportionality.

Thus, the interest calculation cannot be separated from other disputes concerning statistical damages methodology. For example, in assuming proportionality between 1990 and 1994, the special master relied on 1997 data, among other things. For the same reasons that we deferred to the trial court's findings on damages, which accepted some estimates but modified others, we cannot say that the trial court's denial of the C.R.C.P. 59(a) motion as to prejudgment interest was an abuse of discretion.

Thus, we conclude the trial court did not err in refusing to award prejudgment interest for 1990 to 1994.

The judgment is affirmed.

Judge ROTHENBERG and Judge TAUBMAN concur.