**PUEBLO BANCORPORATION,**
a Colorado corporation,
**Petitioner,**

v.

**LINDOE, INC., a Colorado corporation,**
**Respondent.**

No. 01SC645.

Supreme Court of Colorado,
En Banc.

Jan. 21, 2003.

Rehearing Denied Feb. 24, 2003.*

---

* Justice KOURLIS, Justice MARTINEZ and Justice COATS would grant the Petition.

Rothgerber Johnson & Lyons, LLP, Gregory B. Kanan, Cindy C. Oliver, Denver, Colorado, Altman, Keilbach, Lytle, Parlapiano & Ware, P.C., Wm. David Lytle, Pueblo, Colorado, Attorneys for Petitioner.

Fairfield and Woods, P.C., Peter F. Breitenstein, Denver, Colorado, Gradisar, Trechter, Ripperger, Roth & Croshal, Nicholas A. Gradisar, Pueblo, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

In this dissenter's rights action, Petitioner, Pueblo Bancorporation, appeals the court of appeals' reversal of the trial court's determination of the fair value of the shares owned by Lindoe, Inc., a minority shareholder in Pueblo Bancorporation. The parties do not disagree over the value of Pueblo Bancorporation; the only issue is whether the trial court, in assigning a specific "fair value" to Lindoe's shares, should apply a discount to reflect the shares' lack of marketability. The trial court applied such a discount, but the court of appeals reversed and held, as a matter of law, no marketability discount may be applied. We granted certiorari to resolve a conflict in the court of appeals regarding the meaning of "fair value." We hold that "fair value" under the Colorado dissenters' rights statute means the shareholder's proportionate ownership interest in the value of the corporation. Therefore, no marketability discount may be applied. The court of appeals decision is affirmed.

## I. FACTS AND PROCEDURAL HISTORY

Petitioner, Pueblo Bancorporation ("Holding Company"), a Colorado corporation, is a bank holding company whose principal asset is The Pueblo Bank and Trust, a commercial bank with several branches throughout southeastern Colorado. In November of 1997, Holding Company had 114,217 outstanding shares, owned by thirty-eight shareholders—including twenty-nine individuals, two corporations, and seven retirement trusts.

One of Holding Company's corporate shareholders was Respondent, Lindoe, Inc. Lindoe, which is also a bank holding company, first purchased shares in 1988 and has since acquired additional shares as they became available. By November of 1997, Lindoe owned 6,525 (5.71%) of Holding Company's outstanding shares and was its sixth-largest shareholder.

This dispute was set in motion by a change in federal tax law. Prior to 1997, Holding Company was taxed as a corporation under subchapter C of the Internal Revenue Code. I.R.C. § 1361(a)(2). The earnings of a C corporation are subject to double taxation; earnings are taxed once at the corporate level and then taxed a second time at the individual level when distributed to shareholders. In contrast, corporations which qualify under subchapter S of the Internal Revenue Code are not generally subject to double taxation; corporate earnings are not taxed at the corporate level but pass through to the shareholders who pay tax on the corporate income according to their proportionate ownership interest in the entity. I.R.C. § 1363. There are narrow restrictions on the types of corporations that may qualify as S corporations, and prior to 1997, Holding Company could not qualify. However, in 1997, because of certain changes to the rules governing S corporations, Holding Company became eligible to elect S corporation status.

Because of the opportunity to eliminate the double tax, Holding Company's board of directors sought to convert the company into an S corporation. However, they faced two potential obstacles. First, under the Code, an S corporation cannot have a corporation

as a shareholder. I.R.C. § 1361(b)(1)(B). Several of Holding Company's shareholders, including Lindoe, would not qualify to hold stock in Holding Company if it were an S corporation. Second, an election to become an S corporation requires the unanimous approval of its shareholders; a single dissenting vote can block the conversion. I.R.C. § 1362(a)(2).

To avoid both of these potential pitfalls, Holding Company devised a plan to accomplish the conversion through merger. Holding Company created a second corporation, Pueblo Bancorp Merger Corporation (Merger Corp.), which was organized as an S corporation. Three of Holding Company's directors served as directors of Merger Corp. and the officers of the two entities were the same. The two companies entered into a merger agreement, subsequently approved by the shareholders of both companies. The resulting entity was an S corporation which continued operating under the name Pueblo Bancorporation; however, only those shareholders who could legally own shares in an S corporation were eligible to remain shareholders of the surviving corporation. Shareholders, such as Lindoe, that were ineligible to receive shares of the surviving entity received a cash payout in exchange for their Holding Company stock.

After an appraisal of the value of its shares, Holding Company offered $341 per share to the cashed out shareholders. Several shareholders accepted the amount and tendered their stock. Lindoe, however, chose to dissent and seek a higher amount. Pursuant to the procedure set out in Colorado's dissenters' rights statute, Lindoe sent a notice to Holding Company rejecting Holding Company's fair value determination and providing its own estimate of fair value: $775 per share. See § 7–113–209, 2 C.R.S. (2002).

Disputing Lindoe's estimate, Holding Company initiated this action in order to obtain the court's determination of the fair value of Lindoe's shares. See § 7–113–301, 2 C.R.S. (2002).

■ The trial to determine fair value was a classic battle of experts. Holding Company's expert concluded that Holding Company, as an entity, was worth $72.9 million, or $638 per share. Lindoe provided two valuation experts whose estimates regarding the value of Holding Company ranged from $82.8 million to $88.5 million, a per share value of $725 to $775.[1] The primary source of disagreement throughout the proceeding was whether the court should apply a minority or marketability discount to determine the fair value of Lindoe's shares.[2] Holding Company's expert, arguing that the court must apply both a minority and marketability discount in order to accurately reflect the value of Lindoe's shares, applied both discounts to arrive at his final opinion that the shares had a fair value of $344 per share. Lindoe's experts argued that application of discounts was inappropriate; the fair value of the shares in their opinion was between $725 and $775 per share.

The trial court first determined the value of Holding Company as an entity by combining the opinions of two of the experts. It concluded that the enterprise value of Holding Company was $76,087,723, or $666.16 per share. On the issue of discounts, the court was persuaded by Holding Company and applied both a minority discount and a marketability discount to arrive at its fair value determination of $362.03. Because Lindoe had already received $341 for its shares, the court entered judgment in favor of Lindoe in the amount of $137,220.75 ($21.03 times 6,525, the number of shares held by Lindoe).

1. One of Lindoe's experts placed the entity value at between $82.8 and 88.5 million, a per share value of $725 to $775. The other expert placed the entity value at $82.8 million, or $725 per share.

2. The distinction between a minority discount and a marketability discount is important. A minority discount adjusts the value of specific minority shares to reflect the fact that the shares lack sufficient voting power to control corporate decisions and policies. A marketability discount adjusts the value of specific shares to reflect the fact that there is no ready trading market for the shares. Because there are a small number of potential buyers of closely-held corporate stock, a shareholder may be unable to secure a willing buyer if he decides to cash out of his investment. See Edwin T. Hood et. al. Valuation of Closely Held Business Interests, 65 UMKC L.Rev. 399, 438 (1997).

On appeal, the primary issue, as it was in the trial court, was whether it was appropriate to apply a minority or marketability discount. The court of appeals sided with Lindoe and reversed the trial court, holding that the court erred in applying the discounts. *Pueblo Bancorporation v. Lindoe, Inc.*, 37 P.3d 492 (Colo.App.2001).

We granted certiorari to resolve a conflict in the court of appeals regarding the question of whether a marketability discount may be applied in determining "fair value" under the Colorado dissenters' rights statute.[3]

## II. ANALYSIS

At common law, the unanimous consent of shareholders was required for most fundamental corporate changes. While this rule protected minority shareholders by giving them veto power over all fundamental corporate changes, it frequently resulted in deadlock. Over time, corporate governance evolved into a democratic system in which corporate actions typically require only the approval of a majority of shareholders. *See* Barry M. Wertheimer, *The Purpose of the Shareholders' Appraisal Remedy*, 65 Tenn. L.Rev. 661 (1998); *see, e.g.,* § 7–111–103(5), 2 C.R.S. (2002) (requiring the approval of a majority of the votes of each class of shares entitled to vote in order to carry out a merger); § 7–110–103(5), 2 C.R.S. (2002) (requiring the approval of a majority of a quorum of each class of shares entitled to vote in order to amend articles of incorporation).

In order to compensate minority shareholders for the loss of veto power, every state has enacted some form of dissenters' rights statute, also referred to as the appraisal remedy. *See* A.L.I., *Principles of Corporate Governance: Analysis and Recommendations,* Ch. 4 introductory note (1994). Under these statutes, minority shareholders who disagree with certain fundamental changes can force the corporation to buy their shares at a judicially determined price.

Under Colorado's dissenters' rights statute, a dissenting shareholder must follow certain procedures in order to receive the fair value of his shares. First, upon majority shareholder approval of certain corporate actions (listed in section 7–113–102, 2 C.R.S. (2002)), the dissenting shareholder must notify the company of his intention to demand dissenters' rights. § 7–113–204. Upon receiving notice, the company must pay the dissenting shareholder the amount which the company estimates to be the fair value of the dissenter's shares. § 7–113–206. If the dissenting shareholder is dissatisfied with the company's estimate of fair value, he must provide his own estimate and demand payment in that amount from the company. § 7–113–209. Upon receiving such a demand from the dissenting shareholder, the company must either pay the amount of the dissenter's estimate or commence a proceeding for a judicial determination of fair value. § 7–113–301.

Throughout the entire process, the statutory standard of value to which a dissenting shareholder is entitled is "fair value":

> "Fair Value", with respect to a dissenter's shares, means the value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action except to the extent that exclusion would be inequitable.

§ 7–113–101(4), 2 C.R.S. (2002).

This case requires us to determine what the General Assembly meant by "fair value." Our primary task in construing a statute is to determine and give effect to the intent of the General Assembly. *See Kern v. Gebhardt,* 746 P.2d 1340, 1344 (Colo.1987). To discern legislative intent, we first look to the language of the statute and give effect to its terms according to their commonly accepted meaning. *Id.* If the language of the statute is ambiguous, we may pursue alternate modes of construction, including consideration of the legislative purpose, the circum-

---

**3.** We granted certiorari review only on the issue of whether a marketability discount may be applied. We do not review the court of appeals' conclusion that a minority discount should not be applied in determining fair value. *See Pueblo Bancorporation,* 37 P.3d at 496 (citing *M Life Ins. Co. v. Sapers & Wallack Ins. Agency, Inc.,* 40 P.3d 6, 13 (Colo.App.2001)).

stances under which it was adopted, and the consequences of a particular construction. *State Engineer v. Castle Meadows, Inc.,* 856 P.2d 496, 504 (Colo.1993).

■ We conclude that the meaning of "fair value" is ambiguous. It is a term that does not have a commonly accepted meaning in ordinary usage, much less in the business community.[4] As such, we are unable to resolve the issue before us solely by reference to the plain language of the statute.

In addition, as a review of the court of appeals' prior decisions illustrates, the phrase "fair value" has been subject to inconsistent judicial interpretations.

In its first case addressing the meaning of "fair value," the court of appeals concluded, contrary to the argument of a dissenting shareholder, that "fair value" does not necessarily mean par value. *Pioneer Bancorporation v. Waters,* 765 P.2d 597 (Colo.App.1988). The court of appeals encouraged the trial court to consider "all relevant factors" in determining fair value, but did not address the specific issue of whether a minority or marketability discount should be applied. *Id.* at 599.

That same year, another division of the court of appeals concluded that "fair value" may properly be determined by calculating the corporation's "net asset value." *Walter S. Cheesman Realty Co. v. Moore,* 770 P.2d 1308 (Colo.App.1988). That court's opinion is of particular relevance for two reasons. First, the court noted that "fair value" and "fair market value" are not synonymous. *Id.* at 1311. Second, the *Cheesman* court was the first to specifically consider the issue of discounts. It concluded that because the corporation was being liquidated, discounts should not be applied in ascertaining fair value. *Id.* at 1313.

Several years later, the court of appeals held that a dissenting shareholder is entitled to receive the fair value for his shares even though the corporation had a right to redeem the shares at a specific price. *Breniman v. Agric. Consultants, Inc.,* 829 P.2d 493 (Colo.

App.1992). The court construed "fair value" to be synonymous with "fair market value," an interpretation that directly conflicted with the interpretation provided in *Cheesman. Id.* at 497. Because the trial court's determination of fair value was not in dispute, the court of appeals did not address the question of discounts.

After *Breniman* was decided, the legislature twice amended the dissenters' rights statute, once in 1993 and again in 1996. However, neither of these amendments substantively changed the definition of fair value.

Subsequent to the legislative amendments, the court of appeals issued three additional opinions addressing the meaning of "fair value." In 1997, a division of the court explicitly adopted a case-by-case approach to the meaning of fair value and explained that a trial court must consider "all relevant factors" in ascertaining fair value. *WCM Indus., Inc. v. Trustees of the Harold G. Wilson 1985 Revocable Trust,* 948 P.2d 36 (Colo. App.1997). On the specific issue of marketability discounts, the court concluded that a marketability discount may be applied in appropriate circumstances. *Id.* at 39.

Four years later, the court of appeals seemed to relax *WCM's* requirement that the decision of whether to apply discounts be determined by looking at "all relevant factors" on a case-by-case basis. *M Life Ins. Co. v. Sapers & Wallack Ins. Agency, Inc.,* 40 P.3d 6 (Colo.App.2001). Although the court stated that a trial court must consider all relevant factors, it limited the trial court's discretion by holding, as a matter of law, that a minority discount may not be applied in appraising the shares of a going concern. *Id.* at 11, 13. On the issue of marketability discounts, the court agreed with *WCM* and embraced a case-by-case approach. *Id.* at 13–14.

That same year, a division of the court of appeals decided this case. *Pueblo Bancorporation,* 37 P.3d 492. The court agreed with *M Life* in concluding that no minority dis-

---

**4.** The testimony of Holding Company's expert, Leslie Patten, supports our conclusion that the term "fair value" has no common meaning. In

his view, the term is "judicially ambiguous," a legal standard of value, not a "recognized business standard of value."

count should be applied. *Id.* at 496–97. However, it took a position contrary to *WCM* and *M Life* in holding that a marketability discount may not be applied as a matter of law. *Id.* at 499.

The court of appeals has not provided a consistent interpretation of "fair value," especially when confronted with the applicability of discounts. For example, one division of the court concluded that "fair value" does not allow discounts where a corporation is being liquidated, *Cheesman,* 770 P.2d 1308; another division held that "fair value" may include a marketability discount but may never include a minority discount, *M Life,* 40 P.3d 6; and yet another division construed the term to prohibit all discounts as a matter of law, *Pueblo Bancorporation,* 37 P.3d 492.

■ Because we are unable to resolve the meaning of "fair value" by reference to the plain language of the statute, and because of the conflicting interpretations of the term found in prior case law, it is the role of this court to determine the meaning of this statutory phrase. Of course, if the legislature disapproves of our interpretation, it has the power to amend the statute to make its intention clear.

In our view, the term "fair value" could reasonably be subject to one of three interpretations. One possible interpretation, urged by Lindoe, is that fair value requires the court to value the dissenting shares by looking at what they represent: the ownership of a certain percentage of the corporation. In this case, the trial court found that Holding Company, as an entity, was worth $76.1 million. Lindoe owned 5.71 percent of Holding Company and therefore, under this view, Lindoe is entitled to 5.71 percent of Holding Company's value, or just over $4.3 million. Because the proper measure of value is the shareholder's proportionate interest in the value of the entity, discounts at the shareholder level are inapplicable.

Another interpretation of fair value is to value the dissenters' specific allotment of shares, just as one would value the ownership of a commodity. Under this view, although Lindoe's shares represent ownership of 5.71 percent of Holding Company, the "fair value" of its ownership interest is only the amount a willing buyer would pay to acquire the shares. In effect, this interpretation reads fair value as synonymous with fair market value. An investor who wants to buy a minority allotment of shares in a closely-held corporation would discount the price he was otherwise willing to pay for the shares because the shares are a minority interest in the company and are a relatively illiquid investment. Likewise, under this interpretation, the trial court should usually apply minority and marketability discounts.

The third possible interpretation of fair value is a case-by-case approach which allows the trial court to adapt the meaning of fair value to the specific facts of the case. In some circumstances, fair value of a dissenter's shares will mean his proportionate interest in the corporation; in other cases it will mean the fair market value of specific shares valued as a commodity.

For the reasons set forth below, we first hold that the meaning of "fair value" is a question of law, not an issue of fact to be opined on by appraisers and decided by the trial court on a case-by-case basis.

Next, we conclude that fair value must have a definitive meaning; either it is the shareholder's proportionate ownership interest in the corporation or it is the value of the shareholder's specific allotment of shares. We conclude that the legislature chose the term "fair value" for a reason and therefore it must mean something different than "fair market value." To determine the precise meaning of "fair value," we consider the purpose underlying the dissenters' rights statute and the interpretation of "fair value" provided by courts and commentators from around the country.

■ Finally, we hold that the proper interpretation of fair value is the shareholder's proportionate interest in the value of the corporation. Therefore, a marketability discount should not be applied at the shareholder level to determine the "fair value" of the dissenter's shares.

### A. The Error of a Case-by-Case Approach

■ Holding Company urges this court to adopt a case-by-case approach to the mean-

ing of "fair value." This approach would leave the decision of whether to apply a marketability discount in the discretion of the trial court.

■ The interpretation of statutory language is a question of law which we consider de novo. *See People v. Terry*, 791 P.2d 374 (Colo.1990). We conclude that the meaning of "fair value" is a question of law, not a question of fact to be opined on by appraisers and decided by the trial court. *See Balsamides v. Protameen Chemicals, Inc.*, 160 N.J. 352, 734 A.2d 721, 736 (1999).

A case-by-case interpretation of "fair value" results in a definition that is too imprecise to be useful to the business community. Under a case-by-case approach, the parties proceed to trial without knowing what interest the trial court is valuing. In some cases, the trial court may determine that it is "fair" to award the shareholder his pro rata ownership interest in the corporation; in other cases, the court may conclude that it is "fair" to award only the fair market value of the shareholder's specific allotment of shares. Although the difference between the two measures is the single largest variable in the appraisal process, the court's choice of which interpretation to adopt is largely determined by whichever expert the court finds more persuasive.[5]

Both the corporation and the dissenting shareholder are disadvantaged because of the subjective and unpredictable nature of the case-by-case approach. A case-by-case interpretation encourages unnecessary litigation; it is a costly and inefficient means to settle disputes between a corporation and a dissenting shareholder. A definition of "fair value" that varies from one courtroom to

another is no definition at all; this could not be the scheme the legislature intended.

We conclude that a case-by-case approach to the definition of "fair value" is untenable. "Fair value" must have a definitive meaning; either it is the value of the shareholder's proportionate interest in the value of the corporation as an entity, or it is the value of the specific shares in the hands of that particular shareholder. To the extent *M Life* and *WCM* embraced a case-by-case determination of the meaning of "fair value," they are overruled.

We now turn to the language and purpose of the statute to determine which of these two interpretations the legislature intended.

### B. Fair Value Does Not Mean Fair Market Value

■ The interpretation of "fair value" advocated by Holding Company reads the term as synonymous with "fair market value." Under a fair market value standard a marketability discount should be applied because the court is, by definition, determining the price at which a specific allotment of shares would change hands between a willing buyer and a willing seller. However, in a dissenters' rights action, the dissenting shareholder is not in the same position as a willing seller on the open market—he is an unwilling seller with little or no bargaining power. *See Swope v. Siegel–Robert, Inc.*, 243 F.3d 486, 492 (8th Cir.2001). We are convinced that "fair value" does not mean "fair market value."

In the sixty year history of Colorado's dissenters' rights statute, the measure of compensation has changed from "value" to "fair value," but the legislature has never required that dissenters be paid "fair market value" for their shares.[6]

---

**5.** In this case, the court's determination of the fair value of Lindoe's shares varied between $4.3 and $2.4 million based solely on this issue of law.

**6.** The original dissenters' rights statute, enacted in 1941, required dissenters be paid the "value" of their shares. Ch. 41, § 57(5), Colo. Stat. Ann. (1941) (repealed 1958). That remained the standard until 1958 when Colorado adopted the Model Business Corporation Act standard of "fair value." *See* Ch. 32, sec. 76, § 31–31–13 and § 31–33–8, 1958 Colo. Sess. Laws 119, 170–172. Through subsequent amendments, revi-

sions, and recodifications, the standard has remained "fair value." *See* § 31–5–13 and § 31–7–8, 2 C.R.S. (1963) (renumbered 1973); § 7–5–113 and § 7–7–108, 3 C.R.S. (1973) (repealed and recodified 1977); § 7–4–123 and § 7–7–108, 3A C.R.S. (1973 & 1977 Supp.) (repealed and recodified 1981); § 7–4–123 to –124, 3A C.R.S. (1973 & 1981 Supp.) (repealed 1993); § 7–113–101 to –302, 2 C.R.S. (2002).

Fair market value is typically defined as the price at which property would change hands between a willing buyer and a willing seller when neither party is under an obligation to act. *See City of Thornton v. Public Util. Comm'n,* 157 Colo. 188, 196, 402 P.2d 194, 198 (1965); Rev. Rul. 59–60, 1959–1 C.B. 237; Jay W. Eisenhofer & John L. Reed, *Valuation Litigation,* 22 Del. J. Corp. L. 37, 108 (1997). If the General Assembly intended to create a fair market value measure for the price of a dissenter's shares, it knew how to provide it; the phrase has been used many times in a wide variety of other statutes. *See, e.g.,* § 7–106–202(5), 2 C.R.S. (2002) (requiring that a promissory note be supported by collateral having a fair market value at least equal to the principal amount of the note in order for the note to qualify as consideration for the issuance of shares); § 15–11–202(1)(a)(XII), 5 C.R.S. (2002) (requiring that the assets of a decedent's estate, unless otherwise indicated, be measured at their fair market value); § 24–18–104(2), 7B C.R.S. (2002) (forbidding a public officer, legislator, or government employee from receiving compensation for private services which exceeds the fair market value of those services).

We conclude that if the General Assembly intended a dissenter to receive the fair market value for his shares, it would have said so. *See First Western Bank Wall v. Olsen,* 621 N.W.2d 611, 617 (S.D.2001); *Matthew G. Norton Co. v. Smyth,* 112 Wash.App. 865, 51 P.3d 159, 163 (2002) ("It is clear, however, that our Legislature's use of the term 'fair value' was not a slip of the pen—the Legislature did not intend to say 'fair market value,' instead.").

 Nonetheless, Holding Company, in arguing for the application of a marketability discount is, in effect, urging an interpretation of "fair value" that is synonymous with "fair market value."

Holding Company finds support for this position from a recent legislative change to the definition of "fair value." The definition of "fair value" adopted by the General Assembly in 1993 differs from the previous definition in only one way, a single phrase was added:

"Fair Value", *with respect to a dissenter's shares,* means the value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action except to the extent that exclusion would be inequitable.

§ 7–113–101(4), 2 C.R.S. (2002) (emphasis added).

Holding Company argues that the General Assembly added the phrase "with respect to a dissenter's shares" to indicate its intent that fair value is the fair market value of the dissenter's specific shares, not the value of his proportionate ownership interest in the corporation. We disagree.

Colorado's fair value definition was derived from the Model Business Corporation Act (MBCA) which first provided a definition of the term "fair value" in 1978. *See* Model Bus. Corp. Act 2d § 81(a)(3) (1978 Supp.); 33 Bus. Law. 2597 (1978). The definition was adopted nearly verbatim in Colorado in 1981. Ch. 75, sec. 21, § 7–4–123 to –124, 1981 Colo. Sess. Laws 402, 411–414.

The MBCA was revised in 1984 and the definition of "fair value" was amended by adding the phrase on which Holding Company now relies: "with respect to a dissenter's shares." Model Bus. Corp. Act 3d § 13.01(3) (1984). The official comment to the Model Act does not mention the amendment or suggest that any substantive change was intended. The authors of the annotation to the Act indicate only that the "[t]he definition[ ] of ...' fair value'... [is] from the 1978 revision with stylistic changes." Model Bus. Corp. Act Ann.3d § 13.01 annotation (1984).

In 1993, Colorado repealed its corporate code and enacted a new code based on the 1984 Model Act. Ch. 191, § 7–101–101 to § 7–117–105, 1993 Colo. Sess. Laws 732–853. The new definition of fair value included the phrase and has remained unchanged since that date. *See* § 7–113–101(4), 2 C.R.S. (2002).

 We presume the General Assembly does not use language idly and that a statutory amendment reflects a legislative

intent to change the statute's meaning. *See Kern v. Gebhardt*, 746 P.2d 1340 (Colo.1987). However, that presumption may be overcome where the amendment was intended only to clarify existing law. *Id.* at 1346. In this situation, we conclude that the addition of the phrase, "with respect to a dissenter's shares," was not intended to change the meaning of the statute. The more likely reason for the addition of the phrase was simply to clarify that the "fair value" definition provided in the dissenters' rights statute only applies to that particular section and does not apply to other state statutes which use the same term. If the General Assembly intended the substantive change which Holding Company contends that it did, we would expect to see evidence of that intention in the statute's legislative history or the comments to the Model Act. We do not.

Although the plain language of the statute is ambiguous, we conclude that "fair value" is not synonymous with "fair market value." To determine the precise meaning of the term, we next consider the purpose of the statute and the interpretation of "fair value" provided by courts and commentators around the country.

## C. "Fair Value" Means the Shareholder's Proportionate Ownership Interest in the Corporation

We hold that the proper interpretation of fair value is the shareholder's proportionate ownership interest in the value of the corporation, without discounting for lack of marketability. This view is consistent with the underlying purpose of the dissenters' rights statute and the strong national trend against applying discounts.

### 1. Purpose of the Dissenters' Rights Statute

Historically, the dissenters' rights statutes were intended to compensate minority shareholders for the loss of their veto power and to provide liquidity for dissenting shareholders who found themselves trapped in an in-

voluntarily altered investment. *See* Barry M. Wertheimer, *The Purpose of the Shareholders' Appraisal Remedy*, 65 Tenn. L.Rev. 661 (1998); Mary Siegel, *Back to the Future: Appraisal Rights in the Twenty–First Century*, 32 Harv. J. on Legis. 79, 93–97 (1995).

In recent years, the purpose of modern dissenters' rights statutes has been vigorously debated by commentators.[7] The consensus that has developed among courts and commentators is that the modern dissenters' rights statute exists to protect minority shareholders from oppressive conduct by the majority. *See* Wertheimer, *supra*, at 689 ("The case law suggests [the appraisal remedy] does serve several functions, although each involves an overriding goal of minority shareholder protection."); Thompson, 84 Geo. L.J. at 4 ("Now the remedy serves as a check against opportunism by a majority shareholder in mergers and other transactions in which the majority forces minority shareholders out of the business and requires them to accept cash for their shares."); *M Life*, 40 P.3d at 13 (citing *Breniman v. Agric. Consultants, Inc.*, 829 P.2d 493, 496 (Colo. App.1992)) (the purpose of the dissenters' rights statute is "to protect the property rights of dissenting shareholders from actions by majority shareholders which alter the character of their investment.").

The necessity of a dissenters' rights statute for protection of minority shareholders is illustrated by examining the situations in which the remedy is typically used today. The original concern of the appraisal remedy was for shareholders who were trapped in a post-merger investment that did not resemble their original investment. Wertheimer, *supra*, at 667. Today, financial practice and legal environments have changed such that mergers are often used solely to cash-out minority shareholders. *See* Thompson, *supra*, at 25–28 (conducting a survey of appraisal cases over the course of the prior decade and noting that over eighty percent of those cases involved some form of a cash-out merger).

---

7. *See, e.g.,* Daniel R. Fischel, *The Appraisal Remedy in Corporate Law*, 1983 Am. B. Found. Res. J. 875, 877–84 (1983); Hideki Kanda & Saul Levmore, *The Appraisal Remedy and the Goals of* *Corporate Law,* 32 UCLA L.Rev. 429 (1985); Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1 (1995); Wertheimer, *supra.*

In a typical cash-out merger, a corporation creates a shell company which is owned by the corporation's majority shareholders. The original corporation and the shell company merge and only the majority shareholders continue as shareholders of the surviving company; the minority shareholders are involuntarily cashed out of their investment.[8]

The dissenters' rights statute serves as the primary assurance that minority shareholders will be properly compensated for the involuntary loss of their investment. The remedy protects the minority shareholders *ex ante*, by deterring majority shareholders from engaging in wrongful transactions, and *ex post*, by providing adequate compensation to minority shareholders. Wertheimer, *supra*, at 680.

In this case, the sole purpose of the merger between Holding Company and Merger Corp. was to cash out minority shareholders, such as Lindoe, who did not qualify to hold stock in an S corporation.[9] The time and price at which Lindoe was cashed out was determined entirely by Holding Company.

■ The purpose of the dissenters' rights statute would best be fulfilled through an interpretation of "fair value" which ensures minority shareholders are compensated for what they have lost, that is, their proportionate ownership interest in a going concern. A marketability discount is inconsistent with this interpretation; it injects unnecessary speculation into the appraisal process and substantially increases the possibility that a dissenting shareholder will be under-compensated for his ownership interest. An interpretation of "fair value" that gives minority shareholders "less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs." *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997 (Me.1989).

## 2. The National Trend

The interpretation of fair value which we adopt today is the clear majority view. It has been adopted by most courts that have considered the issue, the authors of the Model Business Corporation Act, and the American Law Institute.

### a. Other Jurisdictions

Our interpretation of "fair value" is consistent with the interpretation adopted by most courts that have considered the issue. The interpretation of other states is especially persuasive for two reasons. First, the language of the Colorado statute, because it was based on the Model Act, is nearly identical to the language of dissenters' rights statutes around the country.[10] Forty-five states and the District of Columbia currently have dissenters' rights statutes which, like Colorado, require that a dissenting shareholder be paid "fair value" for his shares.[11] Of these forty-

---

8. The court of appeals opinion in *WCM Industries, Inc.* provides an example of a cash-out merger. In that case, WCM pursued a plan to consolidate ownership of its stock in the hands of those people who were actively involved in its business operations. The board of directors determined the price at which minority shareholders would be cashed out of their investment. Defendants, who collectively owned 30 percent of WCM, were involuntarily cashed out of their investment and the primary means by which they could challenge the price for their shares offered by the corporation was by exercising their dissenters' rights. 948 P.2d 36.

9. The proxy statement sent to shareholders flatly stated that the "purpose of the Merger of Merger Corp. with and into the Holding Company is to eliminate Shareholders who do not qualify as Subchapter S shareholders so that the Holding Company will be eligible to elect to be taxed as a small business corporation under Subchapter S of the Code (an "S Corporation")." Proxy Statement at 5.

10. We note that Colorado's corporate code, while based on the 1984 MBCA, is not a verbatim enactment of the Model Act. Colorado's dissenters' rights statute is no exception; while largely based on the Model Act, the two are not identical. However, the definition section, the most important section for the purpose of this case, is nearly identical to the Model Act and other states that have adopted the Model Act.

11. The five states that use a different term are: (1) California, Cal. Corp.Code § 1300 (West 1990 & Supp.2003) ("fair market value"); (2) Kansas, Kan. Stat. Ann. § 17–6712 (1995 & Supp.2001) ("value"); (3) Louisiana, La.Rev.Stat. Ann. § 12:131(C)(2) (West 1994 & Supp.2002) ("fair cash value"); (4) Ohio, Ohio Rev.Code Ann.

six jurisdictions, five have adopted the definition of "fair value" found in the 1999 amendments to the MBCA and another twenty-seven, including Colorado, have a definition that is identical or nearly identical to that found in the 1984 MBCA.[12]

■ Second, we believe that one of the purposes of the MBCA was to facilitate a degree of national uniformity among state corporate law. Because the General Assembly enacted Colorado's corporate code based largely on the Model Act, we presume that it intended, to some degree, to place Colorado's corporate law in step with the law of other states. Holding Company's interpretation of "fair value" conflicts with the interpretation adopted by most courts that have already considered the issue.

In the leading case regarding discounts, *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del.1989), the Delaware Supreme Court held that discounts should not be used in determining the "fair value" of a dissenters'

shares. In that case, the majority shareholders of a closely-held Delaware corporation, in order to consolidate ownership of the company, approved a short-form merger.[13] The dissenting shareholder, who owned just 1.5 percent of the company's outstanding shares, exercised his dissenters' rights. In determining the fair value of his shares, the Delaware Court of Chancery refused to apply a discount at the shareholder level. The supreme court affirmed:

> [T]he appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for

§ 1701.85(C) (Anderson 2001) ("fair cash value"); and (5) Wisconsin, Wis. Stat. Ann. §§ 180.1301, 180.1130(9)(a) ("market value" for business combinations and "fair value" for other fundamental changes).

12. Those twenty-seven jurisdictions are:
(1) Alabama—Ala.Code § 10–2B–13.01(4) (1999);
(2) Arizona—Ariz.Rev.Stat. § 10–1301(4) (1996);
(3) Arkansas—Ark.Code. Ann. § 4–27–1301(3)(Michie 1991);
(4) Colorado— § 7–113–101(4), 2 C.R.S. (2002);
(5) Florida—Fla. Stat. ch. 607.1301(2) (2001);
(6) Georgia—Ga.Code Ann. § 14–2–1301(5) (1993);
(7) Hawaii—Haw.Rev.Stat. § 414–341 (1993 & Supp.2001);
(8) Idaho—Idaho Code § 30–1–1301(3) (Michie 1999);
(9) Indiana—Ind.Code Ann. § 23–1–44–3 (Michie 1999);
(10) Kentucky—Ky.Rev.Stat. Ann. § 271B.13–010(3) (Michie 1989 & Supp.2002);
(11) Michigan—Mich. Comp. Laws § 450.1761(d) (2001);
(12) Minnesota—Minn.Stat. § 302A.473(1)(c) (2002);
(13) Missouri—Mo.Rev.Stat. § 351.870(4) (2001);
(14) Montana—Mont.Code Ann. § 35–1–826(4) (2001);
(15) Nebraska—Neb.Rev.Stat. § 21–20,-137(4)(1997);

(16) Nevada—Nev.Rev.Stat. Ann. § 92A.320 (Michie 1999);
(17) New Hampshire—N.H.Rev.Stat. Ann. § 293–A:13.01(3) (1999);
(18) North Carolina—N.C. Gen.Stat. § 55–13–01(3)(2001);
(19) Oregon—Or.Rev.Stat. § 60.551(4) (2001);
(20) South Carolina—S.C.Code Ann. § 33–13–101(3) (Law.Co-op.1990);
(21) South Dakota—S.D. Codified Laws § 47–6–40(3) (Michie 2000);
(22) Tennessee—Tenn.Code Ann. § 48–23–101(4) (2002);
(23) Utah—Utah Code Ann. § 16–10a–1301(4) (2001);
(24) Vermont—Vt. Stat. Ann. tit. 11A, § 13.01(3) (1997);
(25) Virginia—Va.Code Ann. § 13.1–729 (Michie 1999);
(26) Washington—Wash. Rev.Code § 23B.13.010(3) (2002);
(27) Wyoming—Wyo. Stat. Ann. § 17–16–1301(a)(iv) (Michie 2001).

13. Under Del.Code Ann. title 8, section 253 (2002), which is similar to Colorado's short-form merger statute, section 7–111–104, 2 C.R.S. (2002), a parent corporation which owns at least ninety percent of a subsidiary's outstanding stock, may merge with the subsidiary, leaving the parent corporation as the survivor and effectively liquidating the investment of the subsidiary's minority shareholders. In a short-form merger, the minority shareholders do not have voting rights; their sole remedy is appraisal.

lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Cavalier,* 564 A.2d at 1145.

Since *Cavalier,* courts across the country have considered the issue of marketability discounts and have generally followed Delaware's lead. Of the jurisdictions with "fair value" statutes, courts in fifteen states have held that a marketability discount should not be applied in determining fair value.[14] *See Offenbecher v. Baron Serv., Inc.,* No. 2000025, — So.2d ——, 2002 WL 959833 (Ala.Civ.App. May 10, 2002); *Devivo v. Devivo,* No. CV980581020, 2001 WL 577072 (Conn.Super.Ct. May 8, 2001) (interpreting "fair value" standard of statute authorizing a buy-out of minority shareholder who has petitioned the court for dissolution of the corporation); *Blitch v. Peoples Bank,* 246 Ga.App. 453, 540 S.E.2d 667 (2000); *In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997 (Me.1989); *Advanced Communication Design, Inc. v. Follett,* 615 N.W.2d 285 (Minn.2000) (interpreting the "fair value" standard of statute authorizing a buy-out of a minority shareholder who has petitioned for corporate dissolution); *Swope v. Siegel–Robert, Inc.,* 243 F.3d 486 (8th Cir.2001) (interpreting Missouri law); *Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519 (1994); *Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 734 A.2d 738 (1999); *Woolf v. Universal Fid. Life Ins. Co.,* 849 P.2d 1093 (Okla. Ct.App.1992) (expressing approval of the Delaware position of prohibiting all discounts at the shareholder level); *Charland v. Country View Golf Club, Inc.,* 588 A.2d 609 (R.I.1991) (interpreting the "fair value" standard of statute authorizing a buy-out of a minority shareholder who has petitioned for corporate dissolution); *Morrow v. Martschink,* 922 F.Supp. 1093 (D.S.C.1995) (same); *First Western Bank Wall v. Olsen,* 621 N.W.2d 611 (S.D.2001); *Hogle v. Zinetics Medical, Inc.,* No. 20000470, 2002 UT 121, 63 P.3d 80 (2002); *U.S. Inspect Inc. v. McGreevy,* No160966, 2000 WL 33232337 (Va. Cir. Ct.

Nov.27, 2000); *Matthew G. Norton Co. v. Smyth,* 112 Wash.App. 865, 51 P.3d 159 (2002).

In addition, five state legislatures have already adopted the 1999 amendments to the MBCA's fair value definition which explicitly prohibit minority and marketability discounts. *See* 2001 Conn. Acts 01–199 (Reg. Sess.) (amending Conn. Gen.Stat. § 33–855 (2001)); 2002 Iowa Legis. Serv. 1154 (West)(effective Jan. 1, 2003) (amending Iowa Code § 490.1301 (1999)); 2001 Me. Legis. Serv. 640 (West) (effective July 1, 2003) (adding Me.Rev.Stat. Ann. tit. 13–C, § 1301(4) (West 1981)); 2000 Miss. Laws ch. 469, § 28 (amending Miss.Code Ann. § 79–4–13.01(4) (1999)); 2002 W. Va. Acts ch. 25 (adding W. Va.Code § 31D–13–1301 (2002)).

Finally, several other states, while not specifically addressing the issue of marketability discounts, have expressed the view that the proper interpretation of "fair value" is the shareholder's proportionate interest of the corporation as a going concern, not the specific stock valued as a commodity. *See Hansen v. 75 Ranch Co.,* 288 Mont. 310, 957 P.2d 32 (1998) (holding, where marketability discount was not the precise issue, that a minority discount may not be applied because the proper measure of value is the shareholder's "proportionate share of the corporation's fair value"); *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.,* 169 Vt. 82, 725 A.2d 927, 931 (1999) (holding, where discounts were not specifically in issue, that a dissenting shareholder is entitled to be paid his "proportionate interest in a going concern"); *HMO–W, Inc. v. SSM Health Care System,* 234 Wis.2d 707, 611 N.W.2d 250, 256 (2000) (prohibiting minority discounts and noting that the "focus of fair valuation is not the stock as a commodity but rather the stock only as it represents a proportionate part of the enterprise as a whole."); *see also Arnaud v. Stockgrowers State Bank,* 268 Kan. 163, 992 P.2d 216 (1999) (interpreting the "fair value" standard of the statute dealing with payment for fractional shares and

---

**14.** Two of these states, Connecticut and Maine, have since adopted the 1999 amendments to the

MBCA which prohibit the use of discounts.

holding that no marketability discount should be applied); *McKesson Corp. v. Islamic Republic of Iran,* 116 F.Supp.2d 13 (D.D.C. 2000) (citing the approval by the "overwhelming majority" of state courts in refusing to apply a marketability discount to determine value of a minority ownership interest which was expropriated by a foreign nation).

In contrast, only six states with "fair value" statutes have clearly concluded that fair value may include marketability discounts.[15] *See Munshower v. Kolbenheyer,* 732 So.2d 385, 386 (Fla.Dist.Ct.App.1999) (interpreting fair value in the context of a buy-out of a shareholder who petitioned for corporate dissolution); *Weigel Broadcasting Co. v. Smith,* 289 Ill.App.3d 602, 225 Ill.Dec. 1, 682 N.E.2d 745 (1996) (holding that the decision of whether to apply a marketability discount is within the trial court's discretion); *Ford v. Courier–Journal Job Printing Co.,* 639 S.W.2d 553 (Ky.Ct.App.1982); *McDonough v. Alpha Const. Eng'g Corp.,* No. 12757, 1994 WL 1031191 (Va. Cir. Ct. May 19, 1994) (trial court, interpreting Maryland law, applied marketability discount in buy-out proceeding); *In re Dissolution of Gift Pax, Inc.,* 123 Misc.2d 830, 475 N.Y.S.2d 324 (N.Y.Sup.Ct. 1984) (interpreting "fair value" in context of statute authorizing buy-out of shareholder who petitioned for corporate dissolution); *Columbia Mgmt. Co. v. Wyss,* 94 Or.App. 195, 765 P.2d 207 (1988).

The clear majority trend is to interpret fair value as the shareholder's proportionate ownership of a going concern and not to apply discounts at the shareholder level. The interpretation urged by Holding Company would position Colorado among a shrinking minority of jurisdictions in the country.

We decline to do so. Although corporate law varies widely among the states, we believe there is some benefit to a consistent interpretation of the same statutory language from one jurisdiction to the next. *See In Interest of R.L.H.,* 942 P.2d 1386 (Colo.App.1997) (holding that Colorado statute, which was adopted from a uniform law, should be construed in conformity with other state's interpretations).

### b. The 1999 Amendments to the Model Business Corporation Act

We also find the recent amendments to the Model Business Corporation Act to be persuasive. In 1999, the MBCA amended its definition of fair value to reflect the national trend against discounts in fair value appraisals. "Fair value," according to the amended definition:

> means the value of the corporation's shares determined:
>
> . . .
>
> (iii) without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to section 13.02(a)(5).

Model Bus. Corp. Act 3d § 13.01(4)(iii) (1984) (amended 1999). The commentary to the 1999 amendments makes clear that the change was an adoption of the "more modern view that appraisal should generally award a shareholder his or her proportional interest in the corporation after valuing the corporation as a whole, rather than the value of the shareholder's shares when valued alone." MBCA § 13.01 official cmt. 2.

---

**15.** This list could arguably include two federal decisions:

First, in Indiana, the district court for the Northern District of Indiana interpreted an earlier Indiana statute and held that a marketability discount was proper in determining "fair value." *See Perlman v. Permonite Mfg. Co.,* 568 F.Supp. 222 (N.D.Ind.1983), *aff'd* 734 F.2d 1283 (7th Cir.1984). However, this case was decided prior to Indiana's revision of their corporate code based on the 1984 Model Act and the extent to which the case represents the law of Indiana has been cast in doubt by a recent court of appeals decision. The court of appeals, interpreting "fair value" under a state statute authorizing the buy-out of a shareholder of a professional corporation, held that no discounts should be applied "where a majority stockholder or corporation purchases the [dissenter's] stock." *Wenzel v. Hopper & Galliher, P.C.,* 779 N.E.2d 30 (Ind.Ct. App.2002).

Second, the district court for the District of Nevada, accepted the fair market value of the dissenter's stock, discounted for marketability, as one factor to consider in determining the "fair value" of a dissenter's shares. *Steiner Corp. v. Benninghoff,* 5 F.Supp.2d 1117 (D.Nev.1998). However, the court ultimately allotted no weight to that factor and it did not affect its determination of fair value. *Id.*

The MBCA has long been the source of Colorado's corporate law, including the dissenters' rights statute. Colorado's first dissenters' rights statute was enacted in 1941 and has undergone numerous revisions since that time. Ch. 109, sec. 5, Ch. 41, § 57(5), 1941 Colo. Sess. Laws 344, 347. Since 1958, when Colorado adopted the first Model Business Corporation Act, the corporate code of this state has been largely modeled after the amendments and revisions to the Model Act. *See* Nancy A. Clodfelter *et. al.*, *An Overview of the New Colorado Business Corporation Act*, 22 Colo. Law. 2337 (1993) (noting that Colorado has been a "Model Act state" since the enactment of the first Model act by the General Assembly in 1958).[16]

In 1984, the Revised Model Business Corporation Act was published. The General Assembly followed suit in 1993 by repealing the entire Corporate Code and enacting, in large part, the 1984 Act. *See* Ch. 191, § 7–101–101 to § 7–117–105, 1993 Colo. Sess. Laws 732–853. The current version of Colorado's dissenters' rights statute, although amended in 1996, remains substantially the same as the 1984 Model Act. The most important part of the statute for the purpose of this case, the definition of "fair value," is nearly identical to the definition found in the 1984 Model Act.

■ Holding Company argues that because the General Assembly has not adopted the 1999 MBCA amendments we should infer that it has rejected them. We are not persuaded. It has been less than four years since the MBCA was amended, too short a period of time to infer intent from legislative inaction.[17] Because the legislature has consistently relied on the MBCA when fashioning the corporate laws of this state we find the views of the MBCA on this issue to be persuasive. *See Offenbecher,* —— So.2d at ——, 2002 WL 959833 at *4; *Blitch,* 540 S.E.2d at 670; *Matthew G. Norton Co.,* 51

P.3d at 164 (in each of these cases, although the dissenters' rights statute was based on the 1984 MBCA and the state legislature had not yet adopted the 1999 amendments to the MBCA, the court nonetheless considered the 1999 MBCA amendments persuasive on the issue of whether to allow discounts in determining fair value); *see also Copper Mountain Inc. v. Poma of America, Inc.,* 890 P.2d 100 (Colo.1995) (noting that the intent of the authors of a model act which has been adopted in Colorado will be presumed to be the same as the intent of the General Assembly).

### c. The American Law Institute

Finally, we are persuaded by the recommendations of the American Law Institute regarding the interpretation of "fair value." The ALI has endorsed the national trend of interpreting fair value as the proportionate share of a going concern "without any discount for minority status or, absent extraordinary circumstances, lack of marketability." A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(a) (1994). To determine fair value, the trial court must determine the aggregate value for the firm as an entity, and then simply allocate that value pro rata in accordance with the shareholders' percentage ownership. A.L.I. § 7.22 cmt. d.

■ The court of appeals explicitly adopted the ALI's definition of "fair value," including the exception for "extraordinary circumstances." The extraordinary circumstances exception is "very limited" and is intended to apply only when the trial court "finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to appraisal so as to divert value to itself that could not be made available proportionately to other shareholders."

---

16. For example, the second edition of the MBCA, published in 1971, provided the basis for the 1977 amendments to Colorado's dissenters' rights statute. *See* Model Bus. Corp. Act 2d §§ 80 and 81 (1971); § 7–4–123 and § 7–7–108, 3A C.R.S. (1973 & 1977 Supp.) (repealed and recodified 1981). Likewise, a 1978 change to the MBCA dissenters' rights statute was adopted by the General Assembly in 1981 using substantially the same language. Model Bus. Corp. Act 2d §§ 80 and 81 (1971 & 1978 Supp.); § 7–4–123 to –124, 3A C.R.S. (1973 & 1981 Supp.) (repealed 1993).

17. By way of comparison, the General Assembly adopted the original version of the Model Act in 1958, eight years after its publication, and it adopted the Revised Model Act in 1993, nine years after it was originally published.

A.L.I. § 7.22 cmt. e. In effect, the exception is intended to leave room for trial courts to exercise their equitable powers in certain extraordinary circumstances to ensure that a fair and just result is reached. The court of appeals concluded, as a matter of law, that the facts of this case did not constitute an extraordinary circumstance.

We believe the court of appeals erred in explicitly adopting the ALI interpretation of fair value. The precise issue for our review is whether a marketability discount may be applied in ascertaining fair value. We hold that "fair value," for the purpose of the dissenters' rights statute, means the shareholder's proportionate ownership interest in the value of the corporation and therefore, it is inappropriate to apply a marketability discount at the shareholder level. Because the issue is not squarely before us, we do not decide the question of whether there may be an equitable exception to this rule, such as the ALI "extraordinary circumstance" exception, which would allow a trial court to apply a marketability discount under certain circumstances.[18]

### III. CONCLUSION

We hold that the term "fair value," for the purpose of Colorado's dissenters' rights statute, means the dissenting shareholder's proportionate interest in the corporation valued as a going concern. The trial court must determine the value of the corporate entity and allocate the dissenting shareholder his proportionate ownership interest of that value, without applying a marketability discount at the shareholder level. The court of appeals decision is affirmed.

Justice KOURLIS dissents and Justice MARTINEZ and Justice COATS join in the dissent.

Justice KOURLIS dissenting:

In my view, defining "fair value" so to extinguish the possibility of marketability discounts in dissenters' rights actions represents a policy decision that the General As-

sembly must make. Our statute is, as the majority notes, ambiguous. Colorado courts, with the exception of the court of appeals' decision in this case, have never interpreted the language of the statute as precluding trial courts from considering a marketability discount in valuing dissenters' shares. We must presume that the General Assembly is aware of those cases.

Despite the national trend to eliminate the marketability discount and the 1999 amendments to the Model Business Corporations Act ("MBCA"), also eliminating marketability discounts, the Colorado General Assembly has made no movement to change the Colorado statute. In my view, we cannot infer from any legislative history surrounding the dissenters' rights statute that the General Assembly has or would mandatorily exclude the use of marketability discounts in arriving at valuation.

Hence, absent a clear legislative declaration, an interpretation of the term "fair value" that essentially gives a shareholder more money for its shares because of a merger than the shareholder would have received immediately prior to the corporate action does not, in my view, comport with the language of the statute or with this state's prior case law.

#### A. Colorado Case Law

For over a decade, Colorado courts have interpreted "fair value" to permit consideration of the lack of marketability of the stock. In 1988, the court of appeals evaluated "fair value" as used in the 1986 dissenters' rights statute. *Walter S. Cheesman Realty Co. v. Moore*, 770 P.2d 1308, 1311 (Colo.App.1988). The statute then defined "fair value" as:

> [T]he value of shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of such corporate action, unless such exclusion would be inequitable.

§ 7–4–124(1)(c), 3A C.R.S. (1986). The 1986 statute is substantially identical to the cur-

---

**18.** At oral argument, Holding Company's counsel conceded that the ALI exception is very limited and would probably not apply to these facts.

Holding Company never argued at any stage of this proceeding that these facts present "extraordinary circumstances."

rent statute, except for the addition of the phrase "with respect to a dissenter's shares." [19] *See* § 7–113–101(4), 2 C.R.S. (2002). In *Cheesman Realty,* the court found that the term encompassed even something broader than "fair market value." 770 P.2d at 1311. The court envisioned that a determination of "fair value" would require a consideration of "all relevant value factors, the most important of which are *market value,* investment or earnings value, and net asset value." *Id.* (emphasis added). Because the court found that fair value was not susceptible to a precise mathematical formula, the court found that trial courts would have to determine the value to place on each factor on a case-by-case basis. *Id.*

Again in 1992, the court of appeals evaluated "fair value" under the 1986 definition in deciding whether the fixed redemption price set in a corporation's articles of incorporation precluded a dissenting shareholder from obtaining fair value for his preferred stock. *Breniman v. Agric. Consultants, Inc.,* 829 P.2d 493, 495 (Colo.App.1992). The court determined that " 'fair value' is akin to fair market value, which is the value a shareholder would receive for his stock if he were able to sell it in an arms-length transaction." *Id.*

In 1997, the court of appeals again addressed the applicability of a marketability discount in a dissenters' rights action. *WCM Indus., Inc. v. Trustees of the Harold G. Wilson 1985 Revocable Trust,* 948 P.2d 36, 38–40, (Colo.App.1997). The court followed its precedent in finding that a determination of fair value requires courts to consider "all relevant factors" and that "a marketability discount may, in appropriate circumstances, be applied, but that such a determination is a factual one that must be made on an *ad hoc,* case-by-case basis." *Id.* at 39 (emphasis in original). Citing *WCM Industries,* the court of appeals again held that trial courts should evaluate the applicability of the marketability discount in each case. *M Life Ins. Co. v. Sapers & Wallack Ins. Agency, Inc.,* 40 P.3d 6, 13 (Colo.App.2001).

There can be no question that, up until the court of appeals' decision in this case, no Colorado court had interpreted the existing statute as precluding application of a marketability discount.

## B. No Legislative Response

Of course, the General Assembly is presumed to know of this authority. *See Vaughan v. McMinn,* 945 P.2d 404, 409 (Colo.1997) (noting that the legislature is presumed to know of judicial precedent in an area of law when it legislates in that area). However, the General Assembly has taken no step to interfere with the courts' application of marketability discounts in dissenters' rights actions. Indeed, the General Assembly considered the statute and made substantive changes in 1993 and again in 1996 without addressing the marketability discount.

## C. The National Trend

The national and scholarly trend toward the elimination of the marketability discount has been evolving for over a decade. The leading Delaware case to which the majority cites in supporting the elimination of the marketability discount across the country was decided in 1989—prior even to Colorado's 1993 amendments to the dissenters' rights statute. Maj. op. at —— (discussing *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del.1989)). The American Law Institute published its interpretation of "fair value," eliminating marketability discounts in 1994, and again, when the General Assembly considered the statute in 1996, it made no move to comport the Colorado statute with the A.L.I. modification. A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.22(a) (1994).

In fact, even though Colorado's corporations code is based largely on the MBCA, the General Assembly explicitly rejected some MBCA changes during this same time frame. The General Assembly did *not* adopt the 1999 changes that abolished illiquidity of stocks from the valuation process.[20]

---

**19.** The majority agrees that addition of the phrase had no substantive effect. Maj. op. at 363.

**20.** The majority opinion notes that the General Assembly waited eight years to adopt the Model

Act and nine years to adopt the Revised Model Act. Maj. op. at 368, n. 17. I would suggest only

Unlike the majority, I take from the General Assembly's inaction an inference that it intended the existing statute, as then being interpreted by the courts, to remain in place. Similarly, I do not infer that because the legislature has adopted most provisions of the Act, it would also adopt the Act's position on marketability discounts. Indeed, Colorado's definition of "fair value" is no longer verbatim to the MBCA's definition, so we cannot infer that the intent of our legislature and the intent of the Model Act drafters exactly comport. *See Copper Mountain, Inc. v. Poma of Am., Inc.*, 890 P.2d 100, 106 (Colo.1995) (holding the court can accept the intent of the drafters of a uniform act as the intent of the legislature by the General Assembly's verbatim enactment of the uniform act's provisions).

Actually, there is an equally plausible inference that can be derived from our General Assembly's actions with regard to the 1996 amendments to the dissenters' rights statute. In 1996, the General Assembly excluded shareholders with shares in a company that is either publicly traded or where there are more than 2,000 shareholders from the dissenters' rights statute. Ch. 248, sec. 30, § 7–113–102(1.3), 1996 Colo. Sess. Laws 1310, 1321. Testimony regarding the enactment of the change supports the change on the grounds that there is an existing market for shares of publicly traded companies that determines the value of those shares, and therefore, it makes most sense to let the market be the mechanism by which the shares are valued, rather than a mechanism of dissent negotiations or court actions. Hearings on H.B. 96–1285 Before the House Comm. on Bus. Affairs & Labor, 60th Gen. Assemb. (Feb. 15, 1996) (statement of Anthony Von Westrum, Colo. Bar Ass'n, Bus. Law Section). The enactment of that legislation was based on a premise that the market value for shares is the best value. It would not make sense to conclude that the General Assembly wanted the market to value stocks for publicly traded companies or where greater than 2,000 shareholders exist, but not where the stock is illiquid. The General Assembly's actions could be interpreted as a

conclusion that shareholders ought to receive the market value for their shares: either established by the market itself or, if necessary, by the court.

Hence, at the point at which the General Assembly was considering the 1996 amendments, the national trend against discounts was well under way. The American Law Institute endorsed valuation without discounts in 1994, and the Delaware Supreme Court decided the case that spawned the debate in 1989. Similarly, our court of appeals had already issued three opinions that supported use of broad valuation techniques, including marketability. Our General Assembly, and the various groups that monitor the need for changes in the law, did not use the occasion of the 1996 amendments to amend the statute in order to join the group of states opting against discounts. Additionally, the General Assembly, in the wake of the more recent court of appeals' decisions permitting the consideration of marketability in valuation, has not taken steps, as other states have, to curb the use of marketability discounts in the valuation process by adopting the 1999 MBCA amendments. *See* 2001 Conn. Acts 01–199 (Reg.Sess.) (amending Conn. Gen.Stat. § 33–855 (2001)); 2002 Iowa Legis. Serv. 1154 (West) (effective Jan. 1, 2003) (amending Iowa Code § 490.1301 (1999)); 2001 Me. Legis. Serv. 640 (West) (effective July 1, 2003) (adding Me.Rev.Stat. Ann. tit. 13–C, § 1301(4)); 2000 Miss. Laws ch. 469, § 28 (amending Miss.Code Ann. § 79–4–13.01(4) (1999)); 2002 W. Va. Acts ch. 25 (adding W. Va.Code § 31D–13–1301 (2002)). The conundrum is that we are assuming that by excluding shareholders who have access to a market for their shares from dissenters' rights, the General Assembly simultaneously granted shareholders who do not have access to a market something of a windfall. In my view, the only clear inference that we can draw from the amendments is a preference for market valuation.

## D. Current Statutory Language

Our statute currently provides that the shares are valued "immediately before the

---

that during that hiatus, Colorado continued to apply the corporations code as it then stood and

did not presage adoption of the Acts by court case.

effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action except to the extent that exclusion would be inequitable." § 7–113–101(4), 2 C.R.S. (2002).

Without imposition of a marketability discount, the amount the dissenting shareholder will receive for his shares will exceed that which he would have received had he sold his stock for some unrelated reason prior to the corporate action. An investor seeking a minority interest in a closely held corporation typically discounts the amount he is willing to pay, because the minority shares represent a relatively illiquid investment. Maj. op. at 360. An investor would not buy minority shares in a close corporation without accounting for the relative illiquidity of the stock. So, in any arms-length transaction that might precede corporate change triggering dissenters' rights, the shareholder receives only that amount that an investor is willing to pay—taking into account the illiquidity of the asset. Consequently, in a situation where that same shareholder is exercising dissenters' rights, he will collect a windfall.

Immediately before the corporate change here, if Lindoe had tried to sell its shares, the buyer would most certainly have negotiated a discount in price to account for the illiquidity of the shares. Lindoe, as a minority shareholder, had to expect the value of shares would reflect the lack of a market for them.

The majority opines that windfall is acceptable since the dissenting shareholder in a corporate action is not a "willing" seller. The underlying policy question is whether the General Assembly intends to penalize corporations for undertaking corporate change with less than unanimous shareholder approval by rewarding dissenting shareholders with a windfall. Although that would be a legitimate policy choice, I do not see the General Assembly as having made it.

Leaving marketability in the determination seems most fair to both parties—as the shareholder gets what he expected out of his investment and the corporation is not unnecessarily penalized for corporate change. The appraisal remedy found in the dissenters'

rights statute continues to protect the interests of the minority shareholder even with the application of the marketability discount because the shareholder is able to collect the value of his shares.

The notion that clarity and predictability are well served by narrowing the number of factors a trial court must consider has obvious merit. I would only add that the real struggle is in arriving at value for the closely-held entity in the first place. The elimination of discounts from the formulation is certainly a move toward greater predictability, but does not change the fact that value is almost always disputed, with both parties' experts relying on a myriad of other considerations and calculations. In sum, under the language of the present statute, it is my view that a marketability discount can be applied by the trial court if that would contribute to ascertainment of a "fair value" assessment.

### E. Conclusion

However persuasive this court views the national trend away from applying marketability discounts, and the amendments to the A.L.I. treatise and the MBCA, the legislature has not given any indication that it seeks to eliminate the discount. As indicated above, the General Assembly has taken no action despite the backdrop of over a decade of Colorado case law allowing the discount and national trends eliminating the use of the discount. I hesitate to assume that our General Assembly shares the intent of the MBCA drafters, particularly in light of the fact that the legislators twice amended the statute since these trends began and saw fit not to make any change to the "fair value" language. To the contrary, there is some indication that the legislature did make an amendment that recognized its preference for a market valuation. Excluding a marketability discount from the valuation process grants minority shareholders a windfall that I am disinclined to bestow absent clear legislative intent.

Accordingly, I respectfully dissent from the majority opinion and would reverse the court of appeals' decision.

I am authorized to state that Justice MARTINEZ and Justice COATS join in this dissent.

